**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 4 2002**

**PATRICK FISHER**
**Clerk**

PUBLISH

### UNITED STATES COURT OF APPEALS

### TENTH CIRCUIT

---

SHARIEFF IMANI SALLAHDIN,
also known as Michael Pennington,

       Petitioner-Appellant,

v.

GARY GIBSON, Warden, Oklahoma
State Penitentiary,

       Respondent-Appellee.

No. 99-6361

---

### APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF OKLAHOMA
### (D.C. No. 97-CV-2051-A)

---

Fred L. Staggs, Oklahoma City, Oklahoma, for Petitioner-Appellant.

William L. Humes, Assistant Attorney General (W.A. Drew Edmondson, Attorney General of Oklahoma, with him on the brief), Oklahoma City, Oklahoma, for Respondent-Appellee.

---

Before **EBEL**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and **BRISCOE**, Circuit Judge.

---

**BRISCOE**, Circuit Judge.

---

Petitioner-Appellant Sharieff Imani Sallahdin, formerly Michael Pennington, [1] appeals from the district court's denial of his federal habeas corpus petition brought pursuant to 28 U.S.C.§ 2254.  In his petition, Sallahdin lodged eleven challenges to his first degree murder conviction and death sentence.  His appeal contests the district court's disposition of each challenge, raising the following issues: (1) four challenges concerning the jury and whether Sallahdin was deprived of due process of law and a fair and impartial jury; (2) whether the information was constitutionally adequate; (3) whether the trial court's failure to define life without parole for the jury was constitutional error; (4) whether the reference to post-arrest silence violated his constitutional rights; (5) whether the two aggravators applied to his sentencing are supported by sufficient evidence; (6) whether the continuing threat aggravator is unconstitutional because it is vague and applied in a standardless manner; (7) whether the jury instructions failed to inform the jury that it did not have to be unanimous to find and apply mitigating circumstances to his sentence; and (8) whether Sallahdin was deprived of admissible mitigation evidence concerning steroid-induced psychosis.  This court has jurisdiction pursuant to 28 U.S.C. § 1291.

Sallahdin's most troubling challenge concerns whether trial counsel was ineffective for failing to present mitigating evidence of the effects of Sallahdin's

---

[1]     Sallahdin formally changed his name.

steroid use on his behavior at the time of the crime. After carefully examining the record, we are persuaded that, had this evidence been presented, there is a reasonable probability the outcome of the sentencing phase would have been different, i.e., that the jury would have imposed a sentence other than death. Because, however, we are not privy to trial counsel's reasons for not presenting this evidence, and because we can envision circumstances where it would have been constitutionally reasonable for counsel not to introduce this evidence despite its potentially mitigative effect, we find it necessary to reverse and remand this case to the district court for an evidentiary hearing solely on this specific issue concerning trial counsel's performance. As regards all other issues raised by Sallahdin, we affirm.

## FACTS

The pertinent facts concerning the murder are undisputed as summarized by the Oklahoma Court of Criminal Appeals in the opinion disposing of his direct criminal appeal. *Pennington v. State,* 913 P.2d 1356 (Okla. Crim. App. 1995), *cert. denied*, 519 U.S. 841 (1996). At approximately 5:00 a.m. on October 21, 1991, James Principe and Bradley Grooms were stocking shelves at the 7-Eleven convenience store where they worked. Principe heard a loud bang and saw a black man looking in Grooms' direction. Principe ducked, made his way to the back of the store and locked himself in the bathroom. After emerging from the

-3-

bathroom, he contacted the police and then saw Grooms lying motionless on the floor with a gunshot wound to the chest. Grooms died from his injuries. Principe later identified Sallahdin as the man who shot Grooms.

That same morning, Lynn Smith stopped at the 7-Eleven to get some ice. Sallahdin was behind the counter and gave her a cup of ice. She did not see anyone else in the store. Upon leaving, she looked back and saw Sallahdin leave the store and drive away in a car. The following day, Sallahdin was taken into custody at his wife's home in Akron, Ohio.

At trial, Sallahdin testified another man committed the murder. The jury convicted Sallahdin of first degree malice murder, which is punishable by death in Oklahoma. When the trial proceeded to the sentencing phase, the State sought the death penalty based on three aggravators: (1) Sallahdin posed a continuing threat to society; (2) he committed the murder to avoid arrest or prosecution; and (3) he knowingly created a great risk of death to more than one person. In addition to the guilt phase evidence about the crime, the State presented evidence of threats Sallahdin made while incarcerated. The jury found all three aggravating circumstances. After Sallahdin presented his own testimony in mitigation and mitigating testimony from friends, family, commanders, peers and others who knew him; the jury determined the aggravating factors outweighed the mitigating evidence and fixed punishment at death.

-4-

On direct appeal, the Oklahoma Court of Criminal Appeals affirmed the conviction and death sentence, after striking the great risk of death to more than one person aggravator and reweighing the remaining aggravators against the mitigating evidence. That court later denied post-conviction relief. *Sallahdin v. State*, 947 P.2d 559 (Okla. Crim. App. 1997).

## STANDARDS OF REVIEW

Because Sallahdin filed his federal habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), that Act governs this court's review. *See Penry v. Johnson*, 121 S. Ct. 1910, 1918 (2001). Under AEDPA, if a claim is adjudicated on its merits in state court, a petitioner is entitled to federal habeas relief only if he can establish that the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2).

> Under § 2254(d)(1), a federal court may grant a writ of habeas corpus only if the state court reached a conclusion opposite to that reached by the Supreme Court on a question of law, decided the case differently than the Supreme Court has decided a case with a materially indistinguishable set of facts, or unreasonably applied the governing legal principle to the facts of the petitioner's case. "Under § 2254(d)(1)'s 'unreasonable application' clause . . ., a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or

-5-

incorrectly. Rather that application must also be unreasonable." "In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." AEDPA also requires federal courts to presume state court factual findings are correct, and places the burden on the petitioner to rebut that presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

*Walker v. Gibson*, 228 F.3d 1217, 1225 (10th Cir. 2000) (quoting and citing

*Williams v. Taylor*, 529 U.S. 362, 411-13 (2000)), *cert. denied*, 121 S. Ct. 2560

(2001).

When the state courts have not considered the claim on the merits and the

federal district court made its determination in the first instance, the district

court's conclusions of law are subjected to *de novo* review and its findings of

fact, if any, are examined for clear error. *LaFevers v. Gibson*, 182 F.3d 705, 711

(10th Cir. 1999). However, if the state courts did not adjudicate the issue on the

merits and the district court did not hold an evidentiary hearing, basing its factual

findings only on a review of the state court record, this court does not give those

findings the benefit of the clearly erroneous standard, but instead conducts an

independent review. *See Walker,* 228 F.3d at 1225 (citing *Smallwood v. Gibson*,

191 F.3d 1257, 1264 n.1 (10th Cir. 1999), *cert. denied*, 531 U.S. 833 (2000)).

## DISCUSSION

## <u>Failure to Excuse Juror for Cause</u>

Sallahdin argues he was deprived of a fair and impartial jury when the trial court did not reopen *voir dire* after juror Lyle Kurtis Cable stated he could not be a fair juror, and then refused to remove him for cause. The parties had passed Juror Cable for cause. Later, during *voir dire* of other prospective jurors, he stated "I can't see myself being a fair juror in this particular case." Tr. Vol. 3 at 10. Immediately thereafter, the court held a bench conference and indicated that if both sides jointly moved to reopen *voir dire*, the motion would be granted. The State did not move to reopen. Defense counsel stated "I think we should hear what he has to say at least, Your Honor," and the judge replied, "All right. Thank you all very much." *Id.* The trial court did not reopen *voir dire* and denied Sallahdin's later challenge for cause.

*Refusal to Reopen Voir Dire* – The Oklahoma Court of Criminal Appeals rejected Sallahdin's claim, stating "the manner and extent of voir dire examination rests within the sound discretion of the trial judge." *Pennington*, 913 P.2d at 1363. The court also noted Sallahdin did not use his peremptory challenges to remove Juror Cable. *Id*. In his application for post-conviction relief, the Oklahoma Court of Criminal Appeals declined to rule on the issue based on the doctrine of *res judicata*. *Sallahdin,* 947 P.2d at 561.

"In a petition for habeas, our inquiry into the conduct of voir dire is limited to whether the trial court's restriction on voir dire rendered the trial fundamentally unfair." *Mayes v. Gibson*, 210 F.3d 1284, 1292 (10th Cir.) (citing *Mu' Min v. Virginia*, 500 U.S. 415, 425-26 (1991)), *cert. denied*, 531 U.S. 1020 (2000). A defendant's right to an impartial jury includes the right to an adequate *voir dire* to identify unqualified jurors. *Morgan v. Illinois*, 504 U.S. 719, 729 (1992); *Moore v. Gibson*, 195 F.3d 1152, 1170 (10th Cir. 1999), *cert. denied*, 530 U.S. 1208 (2000). The trial court, however, retains great latitude in conducting *voir dire*, *Mu'Min,* 500 U.S. at 424, and the Constitution does not require an additional opportunity to make a searching inquiry. *See Moore*, 195 F.3d at 1170.

Here, the parties examined Juror Cable thoroughly with specific questions regarding the death penalty. While he was being questioned on *voir dire*, he affirmatively stated he could be fair and impartial, would follow the court's instructions, and would consider all three possible punishments. Both parties then passed Juror Cable for cause. Significantly, although he had four peremptory challenges remaining, Sallahdin did not use a peremptory challenge to remove Juror Cable. If Sallahdin believed he needed to make further inquiry to determine whether Juror Cable was biased and could not follow the law, he could have used one of his peremptory challenges to remove him from the panel. Based on these

facts and our limited scope of review, we cannot say the trial court abused its discretion when it decided to disallow further inquiry. Sallahdin was not denied his right to a fair and impartial jury. *See Morgan*, 504 U.S. at 730 & n.5; *Mayes*, 210 F.3d at 1292.

*Denial of Request to Remove Juror Cable for Cause --* For similar reasons, Sallahdin's claim of error concerning the trial court's refusal to remove Juror Cable for cause must also fail.

> It is a long settled principle of Oklahoma law that a defendant who disagrees with the trial court's ruling on a for-cause challenge must, in order to preserve the claim that the ruling deprived him of a fair trial, exercise a peremptory challenge to remove the juror. Even then, the error is grounds for reversal only if the defendant exhausts all peremptory challenges and an incompetent juror is forced upon him.

*Ross v. Oklahoma*, 487 U.S. 81, 89 (1988). Sallahdin does not argue he was forced to use his four remaining peremptory challenges to remove incompetent jurors. Rather, he cites to post-trial affidavits of Jurors Marie Bryant and Ruth McGee to support his assertion the jury was biased. Juror Bryant stated she did not want the death penalty, but other jurors believed that if one life is taken another should be given in return. Juror McGee indicated she believed, after hearing the evidence, that the only possible punishments were the death penalty or life without parole.

We agree with the district court that these affidavits merely represent brief, conclusory perceptions and opinions of these jurors, which do not reflect any misrepresentation by themselves or other jurors during *voir dire*. *See United States v. McVeigh*, 118 F. Supp. 2d 1137, 1153 (D. Colo. 2000) (28 U.S.C. § 2255 proceeding) ("statements made by trial jurors after they experienced the entire trial and sentence hearing and after deliberating on the verdicts are not reasonably probative of . . . whether [jurors] could consider the evidence with open minds and follow the court's instructions on the law in both phases of trial"). Therefore, Sallahdin has not shown the trial court abused its discretion or denied him the right to a fair trial when it declined to remove Juror Cable for cause. We affirm the district court's denial of habeas relief on this issue.

### Excusing Two Jurors and Failing to Remove Another for Cause

Sallahdin argues the trial court deprived him of a fair and impartial jury by removing for cause two jurors who had reservations about the death penalty, but who indicated they could still follow the court's instructions and could consider the death penalty as a sentencing option. He also argues the trial court deprived him of a fair and impartial jury by failing to remove for cause another juror who stated he would not consider any penalty other than death for intentional murder.

Thus, Sallahdin contends the jury was not impartial, but instead was death-positive. [2]

It is well-settled that "'a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 420 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)) (emphasis omitted). "The crucial inquiry is whether the venireman could follow the court's instructions and obey his oath, notwithstanding his views on capital punishment." *United States v. Chanthadara*, 230 F.3d 1237, 1270 (10th Cir. 2000) (further quotation omitted), *cert. denied*, 122 S. Ct. 457 (2001). "A trial judge's determination of a potential juror's bias under this standard is a factual finding entitled to a presumption of correctness." *Moore*, 195 F.3d at 1168 (citations omitted).

*Prospective Juror Brierton* -- Sallahdin argues the trial court improperly refused to excuse Darrel K. Brierton for cause, forcing him to exercise a peremptory challenge to remove this juror. The Oklahoma appellate court determined the trial court properly refused to excuse this juror for cause, because

---

[2] Again, Sallahdin cites to the affidavit of Juror Bryant to support his belief that the jurors who served were not entirely truthful about their attitude toward the three possible punishments. We reject this affidavit for the reasons discussed previously.

he unequivocally stated he would follow the instructions, would consider all punishments, and would base his decision on the evidence. *Pennington*, 913 P.2d at 1364. Sallahdin has failed to rebut the presumption of correctness afforded the state court's finding by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

Even if the trial court should have removed Juror Brierton for cause, Sallahdin cured any constitutional error when he used a peremptory challenge to achieve an impartial jury. *United States v. Martinez-Salazar*, 528 U.S. 304, 307 (2000); *Ross*, 487 U.S. at 88. Thus, this claim also fails because Sallahdin has failed to show the jurors who sat were not fair and impartial. *See Ross*, 487 U.S. at 86, 88.

*Prospective Jurors Peck and Gerald* -- Sallahdin argues the trial court improperly excused two jurors for cause. Robert Pruitt Peck, Jr., indicated that, although he believed he could be fair and impartial, he would not consider the death penalty due to his personal beliefs. He did equivocate by saying that maybe, in an extreme circumstance, he could consider the death penalty, and he could base his decision on the judge's instructions and not on his personal opinion. Later, he indicated there must be multiple deaths for him to consider the death penalty. Finally, he indicated he would set aside his personal beliefs and follow the instructions.

Cora Elizabeth Gerald stated she did not believe in the death penalty for any case; nor did she believe she could set aside her personal feelings. Nonetheless, based on defense counsel's questioning, she stated she could follow the judge's instructions.

Examining the entirety of their *voir dire*, the Oklahoma Court of Criminal Appeals determined that even though both prospective jurors indicated they would try to follow the instructions, the bulk of their *voir dire* indicated they could not impose a death sentence. *Pennington*, 913 P.2d at 1364. Thus, the court relied on the trial court's ability to determine whether these jurors would carry out their duties and found no abuse of discretion. *Id.*

We defer to a trial court's finding a juror would be partial because such a finding turns on the juror's credibility and demeanor — matters which the trial court is in the best position to assess. *Witt*, 469 U.S. at 424-26; *Patton v. Yount*, 467 U.S. 1025, 1037 n.12, 1038 & n.14, 1039-40 (1984). Having the benefit of observing demeanor, the trial judge may resolve any ambiguity in favor of the State. *Chanthadara*, 230 F.3d at 1272; *see also Witt*, 469 U.S. at 424, 434 (rejecting idea that juror's bias must be proved with unmistakable clarity to excuse juror for cause).

Again, given the deference we must accord the trial court under the applicable scope of review, it was reasonable for that court to conclude these

-13-

prospective jurors' beliefs would prevent or substantially impair their duties as jurors. Sallahdin has failed to rebut the trial court's finding by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). Therefore, we affirm the district court's denial of his petition for habeas relief on these juror issues.

### State Exercise of Peremptory Challenge Against Black Juror

Sallahdin argues the State improperly used a peremptory challenge to remove Juror Claiborne Cecil Jones, Jr., a black man, without providing a sufficiently race-neutral reason to support the challenge. The prosecutor may not exercise a peremptory challenge on the basis of race. *Batson v. Kentucky*, 476 U.S. 79 (1986). *Batson* sets forth a three-step test for evaluating such claims of racial bias: (1) the defendant must make a prima facie showing the prosecutor exercised peremptory challenges on the basis of race; (2) if the defendant makes a prima facie showing, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the juror; and (3) the trial court must then determine whether the defendant has carried his burden of proving purposeful discrimination. *Purkett v. Elem*, 514 U.S. 765, 767 (1995).

The disposition of a *Batson* claim is a question of fact subjected to the standard enunciated in 28 U.S.C. § 2254(d)(2). *Weaver v. Bowersox*, 241 F.3d 1024, 1029-30, 1031 (8th Cir. 2001). We presume the state court findings are

-14-

correct unless they are rebutted by clear and convincing evidence. *Id.;* 28 U.S.C. § 2254(e)(1).

Here, the prosecutor indicated he based the peremptory challenge primarily on Juror Jones' reservations about imposing the death penalty. In addition, the prosecutor noted Juror Jones had possible pending traffic violations and he had been excused as a juror in another murder case after his brother had been murdered. The Oklahoma Court of Criminal Appeals determined this explanation was race-neutral. *Pennington*, 913 P.2d at 1365 (applying *Batson*).

The record supports a finding that the prosecutor's proffered reasons were not pretextual. *See, e.g., United States v. Barnette*, 211 F.3d 803, 812 (4th Cir. 2000) (deciding that juror's disfavor of death penalty was race-neutral explanation and record supported conclusion that this justification was not pretextual); *United States v. Moore*, 149 F.3d 773, 780 (8th Cir. 1998) (rejecting *Batson* challenge where government struck four jurors due to their opposition to death penalty). Sallahdin has failed to carry his burden of proving purposeful discrimination. *See Moore,* 149 F.3d at 780. Because he has not rebutted the trial court's finding by clear and convincing evidence, we affirm the district court's denial of habeas relief on Sallahdin's *Batson* claim.

**Failure to Remove Sleeping Juror**

Sallahdin argues the trial court should have removed Juror McGee, who allegedly fell asleep during the defense presentation. Sallahdin first raised this claim in state post-conviction proceedings. The Oklahoma Court of Criminal Appeals deemed it waived. *Sallahdin*, 947 P.2d at 560-61 & 561 n.2. This state procedural bar is an independent and adequate state procedural ground to preclude habeas review of this claim. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Hale v. Gibson*, 227 F.3d 1298, 1328 (10th Cir. 2000), *cert. denied*, 121 S. Ct. 2608 (2001).

In an attempt to overcome this procedural bar, Sallahdin asserts his appellate counsel was ineffective in failing to raise this claim on direct appeal. Sallahdin relies exclusively on a post-trial affidavit from the sleeping juror. Although she stated she was "on a lot of medication" and had trouble staying alert during the defense's case due to the defense attorney's "monotone voice," she at no time stated that she actually fell asleep during any portion of the trial. Addendum to Appl. for Post-Conviction Relief, Exh. 12. To the contrary, she stated: "I think that the judge noticed that I was having trouble staying alert. . . . The judge would usually call a recess and I'd become more alert and take my medication." *Id.* In light of the obvious deficiencies in this affidavit, and in light of the fact there is no indication in the trial transcript that the juror ever fell

asleep, there is clearly no basis to the claim. *See generally United States v. Carter*, 433 F.2d 874 (876) (10th Cir. 1970) (concluding duty lies with defendant to promptly bring such matters as an allegedly sleeping juror to the attention of the court). Appellate counsel was not ineffective for failing to raise the issue on direct appeal.

## Failure of Information to Allege Elements of First Degree Murder

*Sufficiency of Information --* Sallahdin argues the State violated his due process rights because the Information improperly failed to allege malice aforethought, an element of first degree murder, as required under the law in effect at the time of the crime. *See* Okla. Stat. tit. 21, § 701.7(A) ("A person commits murder in the first degree when that person unlawfully and with malice aforethought causes the death of another human being. Malice is that deliberate intention unlawfully to take away the life of a human being, which is manifested by external circumstances capable of proof."). Sallahdin first raised this claim on direct appeal, after the appeal had been fully briefed, in a motion to present an additional issue based on an intervening change of law. Sallahdin argued that *Pickens v. State*, 885 P.2d 678, 683 (Okla. Crim. App. 1994), [3] the intervening

---

[3] *Pickens* was overruled by *Parker v. State*, 917 P.2d 980, 986 (Okla. Crim. App. 1996) (failure of Information to allege all elements of crime is not jurisdictional, rather, court must determine whether defendant was denied due process; i.e., whether the Information provided defendant with adequate notice of

(continued...)

-17-

change of law, required the Information to allege malice aforethought in order to allege the elements of malice aforethought murder. The Oklahoma Court of Criminal Appeals granted the motion, but did not address the issue in its opinion. Sallahdin requested rehearing. Without explanation, the court denied rehearing. Sallahdin again raised the issue in post-conviction proceedings, but the Oklahoma Court of Criminal Appeals declined to consider it. *Sallahdin*, 947 P.2d at 560-61 & 561 n.2.

The Information provided:

> [O]n or about the 21st day of October, 1991, MICHAEL L. PENNINGTON then and there being, did then and there, willfully, unlawfully, wrongfully, and feloniously commit the crime of: **MURDER FIRST DEGREE** in the manner and form as follows, to-wit: That the said MICHAEL L. PENNINGTON did unlawfully, wilfully and feloniously, without authority of law, and with a premeditated design to effect the death of one Bradley Thomas Grooms, a human being, did then and there kill one Bradley Thomas Grooms by means of a firearm loaded with powder and shot, held in the hands of the said defendant and with which he fired shot into the body of the said Bradley Thomas Grooms, causing mortal wounds in the body of the said Bradley Thomas Grooms, from which mortal wounds the said Bradley Thomas Grooms did languish and die.

D. Ct. Rec. Vol. 1 at 1.

In Oklahoma, an Information must contain "[a] statement of the acts constituting the offense, in ordinary and concise language, and in such manner as

---

[3](...continued)
the charges against him and apprised him of what he must defend against at trial).

-18-

to enable a person of common understanding to know what is intended." Okla. Stat. tit. 22, § 401(2). A challenge to the adequacy of the Information under Oklahoma law, however, is a question of state law, which this court has no power to address. *Johnson v. Gibson*, 169 F.3d 1239, 1252 (10th Cir.), *cert. denied*, 528 U.S. 972 (1999). Rather, this court may grant habeas relief only if the state court error deprived the defendant of fundamental rights guaranteed by the Constitution. *Id.* An Information may violate the Sixth Amendment by failing to provide adequate notice of the nature and cause of the accusations against the defendant. *Id.*; *see also Hamling v. United States*, 418 U.S. 87, 117 (1974) (providing indictment is sufficient if it contains elements of the charged offense, fairly informs defendant of charge against which he must defend and allows the defendant to bar future prosecutions for the same offense).

Considering the Information along with the material available at the preliminary hearing and through discovery, we conclude Sallahdin received sufficient notice of the charge against him. The specific intent element of first degree murder was sufficiently alleged by use of the words "premeditated design." *Cf. Van White v. State*, 990 P.2d 253, 261 (Okla. Crim. App. 1999) (citing Okla. Stat. tit. 21, § 701.7(A)); *Toles v. State*, 947 P.2d 180, 184 (Okla. Crim. App. 1997). *See generally* Black's Law Dictionary 969, 1199 (7th ed. 1999) (defining malice aforethought as the requisite mental state for common-law

murder, including intent to kill; defining premeditated as a killing done with willful deliberation and planning). The record is clear that Sallahdin knew he was charged with malice aforethought murder. There was no confusion, as there was in *Pickens* , that the State may have instead charged him with felony murder. *Cf. Toles* , 947 P.2d at 184-85 (recognizing defect in *Pickens* was irreconcilable confusion whether Information charged felony or malice aforethought murder). Furthermore, in closing argument, the State acknowledged it must prove malice aforethought. Finally, the trial court here instructed the jury on malice aforethought murder. *See generally Penry* , 121 S. Ct. at 1922 (presuming jurors follow instructions).

*Ex Post Facto* -- Sallahdin also argues that application of *Parker* violates ex post facto prohibitions because, in his view, *Parker's* overruling of *Miller v. State* , 827 P.2d 875, 879 (Okla. Crim. App. 1992), was unforeseeable and indefensible. Whether an *ex post facto* violation has occurred presents a question of law. *Cf. Lustgarden v. Gunter*, 966 F.2d 552, 553 (10th Cir.1992). "To fall within the ex post facto prohibition, a law must be retrospective–that is, it must apply to events occurring before its enactment–and it must disadvantage the offender affected by it, by altering the definition of criminal conduct or increasing the punishment for the crime." *Lynce v. Mathis*, 519 U.S. 433, 441 (1997) (quotations and citations omitted). Although "[t]he Ex Post Facto Clause is a

-20-

limitation upon the powers of the Legislature and does not of its own force apply to the Judicial Branch of government," *Marks v. United States*, 430 U.S. 188, 191 (1977) (citation omitted), the Supreme Court has recognized that "limitations on *ex post facto* judicial decisionmaking are inherent in the notion of due process." *Rogers v. Tennessee*, 121 S. Ct. 1693, 1697 (2001). We therefore proceed to analyze Sallahdin's claim in the context of the Due Process Clause.

We fail to see any due process problem arising out of the application of *Parker* to Sallahdin's case. To begin with, we note that the decision in *Parker* had nothing "to do with the definition of crimes, defenses, or punishments." *Collins v. Youngblood*, 497 U.S. 37, 51 (1990). Instead, it addressed an issue of state criminal procedure, announcing that an information need not allege each element of a charged crime, and that a trial court's subject matter jurisdiction is not dependent upon an information containing each element of the charged crime. Thus, *Parker* does not fall within the scope of what could even remotely be described as *ex post facto* judicial decisionmaking. *See Collins*, 497 U.S. at 45.

Even if we were to conclude otherwise, it is apparent after reviewing Oklahoma case law that the decision in *Parker* was foreseeable and defensible. *See Fultz v. Embry*, 158 F.3d 1101, 1103 (10th Cir. 1998) (discussing the test for determining whether the retroactive application of a judicial decision violates due process). Since the early 1900s, Oklahoma statutes have required that an

information "contain a statement of the acts constituting the offense, in ordinary and concise language, and in such manner as to enable a person of common understanding to know what is intended." *Parker*, 917 P.2d at 985; *see Miller*, 827 P.2d at 880 (Lumpkin, Vice-Presiding J., concurring in part and dissenting in part). Although the language of these statutes has remained constant, judicial interpretation of them by the Oklahoma Court of Criminal Appeals has "continually changed and show[n] at least two distinct paths." *Miles v. State*, 922 P.2d 629, 631 (Okla. Crim. App. 1996); *see Miller*, 827 P.2d at 880 (Lumpkin, Vice-Presiding J., concurring in part and dissenting in part) (noting "diametric opposing lines of caselaw authority" in Oklahoma concerning the sufficiency of an indictment). On one side of the ledger were cases, such as *Miller* and *Pickens*, which construed the Oklahoma statutes as requiring an information to "allege all elements of the crime charged." *Parker*, 917 P.2d at 985. On the other side of the ledger were cases which, consistent with the statutory language, simply required that an information place a defendant on notice of the facts constituting the charge against him. *See Miller*, 827 P.2d at 880 ((Lumpkin, Vice-Presiding J., concurring in part and dissenting in part) (citing cases). In light of this history, as well as the divergence of opinion on the issue among members of the Oklahoma Court of Criminal Appeals, it was not at all unforeseeable that the court attempt to reconcile its case law in *Parker*. Moreover, we believe that the decision in

*Parker* is entirely consistent with the language of the Oklahoma statutes governing the requirements for an information. *See Miles*, 922 P.2d at 631 (rejecting identical *ex post facto* attack on *Parker*).

### **Failure to Define Life Without Parole**

Sallahdin argues the jury instructions should have defined life without parole further, because post-conviction juror interviews revealed that if jurors had known he would spend the rest of his life in prison with a sentence of life without parole, some jurors would have selected that sentence. He maintains the trial court's failure to instruct, and counsel's failure to request an instruction, regarding parole ineligibility violates *Skipper v. South Carolina*, 476 U.S. 1, 4-5 & 5 n.1 (1986), and *Simmons v. South Carolina*, 512 U.S. 154, 156, 171 (1994) (plurality).

Sallahdin first raised this claim in post-conviction proceedings. The Oklahoma Court of Criminal Appeals therefore deemed it waived because Sallahdin could have, but did not, raise it on direct appeal. *Sallahdin*, 947 P.2d at 560-61 & 561 n.2. Although the State continues to assert this claim is procedurally barred, we instead address this claim's merits, because the denial of relief can be "more easily and succinctly affirmed" on that basis. *Romero v. Furlong*, 215 F.3d 1107, 1111 (10th Cir. 2000), *cert. denied*, 531 U.S. 982 (2000). Indeed, this court has previously rejected this claim. *Mayes*, 210 F.3d at 1294.

Further, defense counsel, in his sentencing phase closing argument, explained that life without parole meant that Sallahdin would die in prison. Tr. Vol. 9 at 37. Neither the trial court's failure to instruct on parole nor counsel's failure to request an instruction violated Sallahdin's constitutional rights.

**Prosecutor's References to Sallahdin's Post-Arrest Silence**

Sallahdin argues the prosecutor's improper comments on his post-arrest silence denied him a fair trial. In *Doyle v. Ohio*, the Supreme Court held a prosecutor deprives a criminal defendant of due process by making improper comments about the defendant's post-*Miranda*[4] silence. 426 U.S. 610, 611, 619 (1976). Such impeachment is "fundamentally unfair because *Miranda* warnings inform a person of his right to remain silent and assure him, at least implicitly, that his silence will not be used against him." *Anderson v. Charles*, 447 U.S. 404, 407-08 (1980). *Doyle*, however, does not bar cross-examination concerning a defendant's prior inconsistent statements. *See, e.g., Anderson*, 447 U.S. at 408; *Earnest v. Dorsey*, 87 F.3d 1123, 1135 (10th Cir. 1996). "Such questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all." *Anderson*, 447 U.S. at 408.

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

According to Sallahdin, the prosecutor improperly asked Lieutenant Pfahl on direct examination if Sallahdin had invoked his right to an attorney during interrogation. Sallahdin first challenged this questioning in his petition for a writ of habeas corpus. Because the State does not raise any exhaustion or procedural bar concerns, we consider this portion of the claim on its merits, reviewing *de novo*. *See Moore*, 195 F.3d at 1178.

Sallahdin fails to indicate how asking this question violated his right to remain silent. The right to an attorney is separate and distinct from the right to remain silent. *See generally Michigan v. Mosley*, 423 U.S. 96, 101 n.7 (1975). Even if the question was tantamount to asking if Sallahdin invoked his right to silence, the record shows he had waived that right.

Sallahdin further argues the prosecutor improperly asked Detective Mahamed when he first heard about Sallahdin's involvement in gun-running and exchange of weapons. The record shows the Oklahoma Court of Criminal Appeals reasonably determined Sallahdin expressly waived his right to remain silent during his initial contact with police in Oklahoma. *Pennington*, 913 P.2d at 1366.

Sallahdin also argues the prosecutor improperly cross-examined him by asking him if he ever told the Akron police that another man shot the victim and that man's fingerprints would be on the shotgun, which was at Sallahdin's home.

He maintains the prosecutor improperly asked him if it was accurate that he remained silent when Detective Mahamed asked him why this death occurred. Viewed in context, these questions were designed to elicit an explanation for a prior inconsistent statement, not to infer guilt from Sallahdin's post-arrest silence. *Anderson*, 447 U.S. at 409; *cf. United States v. Canterbury*, 985 F.2d 483, 486 (10th Cir. 1993) (reaching opposite conclusion under different set of facts). Citing *Anderson*, 447 U.S. at 408-09, the state appellate court reasonably held the prosecutor's cross-examination of Sallahdin was within permissible limits because he presented a new story at trial that was materially different from the information he provided to the police. *Pennington*, 913 P.2d at 1366.

The Oklahoma Court of Criminal Appeals also determined that even if the prosecutor's isolated remarks were erroneous, they were harmless. *Pennington*, 913 P.2d at 1366. Because the state appellate court did not rely on Supreme Court authority in assessing harmlessness, we assess whether the challenged comments had "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quotation omitted); *see also Hale*, 227 F.3d at 1324-25; *Bryson v. Ward*, 187 F.3d 1193, 1204-06 (10th Cir. 1999), *cert. denied*, 529 U.S. 1058 (2000).

We may consider the following factors in assessing harmless error: (1) the prosecutor's use of the post-arrest silence; (2) whether the defense or prosecution

pursued this line of questioning; (3) the amount of evidence indicating guilt; (4) the frequency and force of the reference; and (5) if the defense requested a mistrial or curative instructions. *See Canterbury*, 985 F.2d at 486-87. The first and third inquiries are the most important. *Id.* at 487.

The evidence of Sallahdin's guilt was overwhelming. The prosecutor did not attempt to use this information to establish guilt, nor did he pursue further questioning after the trial court sustained defense objections. In addition, on cross-examination of Mahamed, defense counsel emphasized that Sallahdin remained silent when asked certain questions. Tr. Vol. 5 at 63-66. Thus, any error was harmless. [5]

**Sufficiency of the Evidence to Support the Aggravating Factors**

Sallahdin argues insufficient evidence exists to support the jury's findings that he intended to kill the victim to avoid arrest or prosecution and that he poses a continuing threat to society. In assessing sufficiency of the evidence, the relevant question is whether, after viewing all of the evidence in the light most

---

[5]    Sallahdin attempts to show any error was not harmless by the post-conviction affidavit of Juror Barbara Bowen, which indicated she was bothered by Sallahdin's failure to tell law enforcement initially that there was another shooter. His failure to do so apparently influenced her perception of his truthfulness. We agree with the district court that this affidavit does not indicate whether the remarks elicited by defense counsel or the prosecutor concerned her. It therefore fails to establish error.

favorable to the State, a rational factfinder could have found the existence of the aggravating factor beyond a reasonable doubt. *Lewis v. Jeffers*, 497 U.S. 764, 780-82 (1990).

*Avoid Arrest or Prosecution Aggravator* – Sallahdin asserts, without discussion, that insufficient evidence exists to support this aggravator. We need not consider this undeveloped argument. *See Walker*, 228 F.3d at 1240. Because this is a capital case, however, we will consider this claim. The Oklahoma Court of Criminal Appeals' determined there was sufficient evidence to support this aggravator. [6]

> [Sallahdin] shot Grooms almost immediately upon entering the store. No evidence was presented that the victim posed any threat to [Sallahdin] or that he even attempted to defend himself. Once Grooms had been shot several times, [Sallahdin] did not go near him, but rather, attempted to rob the store by repeatedly shooting the cash register. Because he was unable to open the cash register, [Sallahdin] was forced to leave empty-handed.
>     Additional evidence to consider is that [Sallahdin] wore no disguise, nor made any attempt to conceal his identity, other than killing the only person he saw in the store. Furthermore, by the time the witness Lynn Smith entered the store for a cup of ice, [Sallahdin] had no means to shoot her as he had run out of ammunition.

---

[6]    This circuit has not resolved whether sufficiency of the evidence is a factual or legal question. *Hale*, 227 F.3d at 1335 n.17. We need not resolve this question in this case. In either event, the Oklahoma appellate court's determination is reasonable. *See* 28 U.S.C. § 2254(d)(1), (2); *see also Hale*, 227 F.3d at 1335 n.17.

*Pennington* , 913 P.2d at 1371.  We conclude that determination was not unreasonable.

*Continuing Threat Aggravtor* --    Sallahdin also contends that commission of the crime, by itself, is insufficient evidence to show he would be a continuing threat to society.  In Oklahoma, however, the continuing threat aggravator's existence, as the Oklahoma Court of Criminal Appeals noted, may be based solely on the evidence of the calloused nature of the crime.     *Pennington* , 913 P.2d at 1371; *accord Cooks v. Ward* , 165 F.3d 1283, 1289 (10th Cir. 1998),     *cert. denied* , 528 U.S. 834 (1999);   *Snow v. State* , 876 P.2d 291, 298 (Okla. Crim. App. 1994).  In determining there was sufficient evidence, the state appellate court did not rely solely on the underlying crime, however.

> [Sallahdin] immediately shot the victim upon entering the store. Grooms was shot as a matter of course in [Sallahdin's] attempted robbery.  Grooms was never given an opportunity to cooperate in any way to save his life.  In addition to this evidence, other evidence was presented that [Sallahdin] had made threats of violence while in custody.

*Pennington* , 913 P.2d at 1371.  This determination was not unreasonable under either 28 U.S.C. § 2254(d)(1) or (2).     *See Hale* , 227 F.3d at 1335 n.17.

## Constitutionality of Continuing Threat Aggravator

Tenth Circuit precedent forecloses Sallahdin's argument that Oklahoma's application of the continuing threat aggravator is unconstitutional.     *See, e.g.* ,

*Medlock v. Ward*, 200 F.3d 1314, 1319 (10th Cir.), *cert. denied*, 531 U.S. 882 (2000).

## Mitigating Evidence Instruction

Sallahdin argues the mitigating instructions suggested the jury must find the mitigating factors unanimously, because they were "sandwiched" among the instructions requiring unanimity in finding the aggravating factors. However, he recognizes this court has rejected similar arguments. *See, e.g.*, *Fox v. Ward*, 200 F.3d 1286, 1302 (10th Cir.), *cert. denied*, 531 U.S. 938 (2000); *Smallwood*, 191 F.3d at 1270-71; *Duvall v. Reynolds*, 139 F.3d 768, 791-92 (10th Cir.1998). Because we are bound by circuit precedent, this claim is foreclosed. *See, e.g.*, *Smallwood*, 191 F.3d at 1271.

## Steroid-Use Evidence

Sallahdin argues the trial court erroneously denied him an opportunity to present mitigating evidence that he was experiencing psychiatric effects from anabolic steroid use at the time of the crime. According to Sallahdin, the steroids, taken to enhance his weight lifting and body building regimen, altered his normal behavior and therefore the trial court wrongly prevented him from explaining what transformed him from a disciplined soldier into a fleeing killer. He contends that if this steroid evidence had been admitted, he probably would not have received a death sentence. He also argues his conviction and death

sentence are constitutionally infirm because counsel rendered ineffective assistance in failing to investigate and present evidence of the effects of his anabolic steroid use on his behavior at the time of the crime. Apt. Reply Br. at 19-20.

*Preclusion of Steroid Evidence by Trial Court --* Prior to trial, Sallahdin disclosed that he intended to present the testimony of Dr. Harrison Pope, a psychiatrist and steroid expert. The State filed a motion *in limine* requesting that the trial court enter an order prohibiting any testimony concerning "Steroid Rage Syndrome." At the hearing on the motion, Dr. John A. Call, a psychologist, testified for the State that "Steroid Rage Syndrome" is not generally accepted as a bona fide diagnosable syndrome. Tr. of Hear'g of May 4, 1993 at 4-6, 14.

During the hearing, Sallahdin's counsel stated the defense intended to call Dr. Pope only at the sentencing phase to introduce expert testimony that steroid use may explain the change in Sallahdin's personality, and did not necessarily intend to refer to "Steroid Rage Syndrome." *See id.* at 18-19. The trial court granted the State's motion *in limine,* limiting its decision to finding only that the State showed there is no scientific theory called "Steroid Rage Syndrome." *Id.* at 19-20. The court acknowledged there may be other reasons steroid-use evidence could be admissible and ordered written notice of Dr. Pope's testimony. *Id.* at 20, 30; D. Ct. Rec. Vol. 3 at 77. In sum, contrary to Sallahdin's contention the trial

court denied him the opportunity to present any steroid use testimony during either stage of the trial, the trial court precluded only expert testimony concerning "Steroid Rage Syndrome," not all testimony, be it expert or otherwise, concerning the effects of steroid use on Sallahdin.

Sallahdin filed a discovery supplement withdrawing Dr. Pope as a possible first-stage witness and, in response to the trial court's order, delineating Dr. Pope's anticipated sentencing phase testimony. The supplement anticipated Dr. Pope would testify: (1) steroids caused manic symptoms while Sallahdin took them and depressive symptoms and impulse control disorder during his withdrawal from them; and (2) to a reasonable medical certainty, the change in Sallahdin's behavior was attributable to steroid use. D. Ct. Rec. Vol. 3 at 70-73. The supplement also represented Dr. Pope would not testify that "Steroid Rage Syndrome" is a mental illness or that it was identified as such in the medical or scientific communities. *Id*. at 73.

Approximately one month before trial, in a motion to prohibit the State's expert from examining Sallahdin, counsel again set forth his purpose for presenting expert testimony on the effect of steroids on Sallahdin. D. Ct. Rec. Vol. 3 at 92-96. The motion indicated steroid use was comparable to problems caused by alcohol consumption, was not a mental illness, and the steroid evidence would only be used as mitigating evidence during the sentencing phase of the trial

to show the effects of steroid use on Sallahdin — not to show steroids caused him to commit the murder, or to lower the degree of homicide, or as a defense. *Id.* at 92, 93-94. Despite the court-ordered supplementation of Dr. Pope's testimony and the motion delineating the intended use of the testimony, counsel failed to call on Dr. Pope to testify or to present any steroid evidence to the jury at either stage of the trial.

Sallahdin now argues on federal habeas that the trial court erred in precluding evidence concerning the effects of steroid use during the trial. Neither the trial court nor the state appellate court addressed this specific issue on the merits. *See Pennington*, 913 P.2d at 1370. The federal district court did not hold an evidentiary hearing on the matter and relied solely on the state court record. Accordingly, we review the federal district court's conclusions of law *de novo* and perform an independent review of its factual findings. *See LaFevers*, 182 F.3d at 711; *Walker*, 228 F.3d at 1225.

The federal district court determined the trial court did not err in refusing to admit steroid-use evidence because: (1) "Steroid Rage Syndrome" was not shown to be a reliable theory at the time of the hearing, under either *Frye* or *Daubert;* [7] (2) counsel specifically denied any intent to use the testimony during

---

[7] *Frye v. United States*, 293 F.1013 (App. D.C. 1923); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

the guilt phase; and (3) counsel did not request permission to present the evidence at the sentencing proceeding. ROA, Vol. 1, Doc 27 at 5-6; 8-11. Although we agree with the district court's determinations, the dispositive fact is that the trial court did not actually preclude presentation of evidence about the effects of steroid use on Sallahdin.

The trial court's ruling precluded only evidence of "Steroid Rage Syndrome." The court expressly left open the possibility of introducing other steroid evidence and ordered counsel to provide the State with clarification of the steroid expert's probable testimony. Counsel subsequently provided a detailed discovery supplement containing the steroid expert's anticipated testimony. D. Ct. Rec. Vol. 3 at 70-73. Counsel, however, did not attempt to present such evidence to the jury and did not ask the trial court for a ruling on its admissibility. Consequently, the trial court never ruled on the admissibility of the steroid use evidence and did not preclude Sallahdin from introducing such evidence at either stage of the trial. Accordingly, the trial court did not err as Sallahdin claims. *See Romano v. Gibson*, 239 F.3d 1156, 1167 (10th Cir.), *cert. denied,* 122 S. Ct. 628 (2001). The constitutional error, if any, stems from defense counsel's actions.

*Ineffective Assistance of Counsel --* We now turn to Sallahdin's claim that his trial counsel was ineffective because counsel failed to investigate and present evidence concerning the effects of steroid use to the jury. Sallahdin first

presented this argument in post-conviction proceedings.     The Oklahoma Court of Criminal Appeals determined the claim was barred because it did not turn on facts unavailable at the time of the direct appeal.     *Sallahdin* , 947 P.2d at 562.  When Sallahdin again asserted the claim in his federal habeas petition, the State, relying on our decision in   *Brecheen v. Reynolds*   , 41 F.3d 1343, 1363 (10th Cir. 1994), conceded that the Oklahoma Court of Criminal Appeal's procedural bar ruling was not binding for purposes of federal habeas review.  Dist. Ct. R., Doc. 21 at 10.  Accordingly, the federal district court resolved the claim on the merits. Although the State now makes a conclusory suggestion that the claim is procedurally barred, Response to Apt. Br. at 13 n.1., this assertion is insufficient to preclude consideration of the merits.     *See Walker* , 228 F.3d at 1240 (refusing to consider conclusory, unsupported and undeveloped arguments).

Even if the State had adequately addressed the procedural bar issue, we would not be bound by the Oklahoma Court of Criminal Appeal's ruling.  In order to prevail on a procedural bar claim, the State must demonstrate that the Oklahoma Court of Criminal Appeals could have resolved Sallahdin's claim of ineffective assistance of counsel on direct appeal on the basis of the trial record alone.  *See, e.g., McGregor v. Gibson,*    219 F.3d 1245, 1252 (10th Cir. 2000). Although the trial record indicates that trial counsel made preparations to present the expert testimony of Dr. Pope, it is silent regarding why trial counsel

ultimately failed to present that testimony. Further, Sallahdin's claim depends, to some extent, on post-conviction affidavits that are not part of the trial record. Therefore, the State's procedural bar is inadequate to preclude habeas review. *See Romano*, 239 F.3d at 1180 (citing *English v. Cody*, 146 F.3d 1257, 1264 (10th Cir. 1998)).

Because the state courts did not address the merits of this ineffective assistance of counsel claim, we review the district court's conclusions of law *de novo*. *LaFevers*, 182 F.3d at 711. Claims of ineffective assistance of counsel are mixed questions of law and fact. *See Strickland v. Washington*, 466 U.S. 668, 698 (1984). To establish ineffective assistance of counsel, Sallahdin must meet both prongs of the *Strickland* analysis. First, he must prove counsel's performance was constitutionally deficient. Second, he must show counsel's deficient performance prejudiced his defense, depriving him of a fair trial with a reliable result. *Id.* at 687.

To prove deficient performance, Sallahdin must show "counsel's representation fell below an objective standard of reasonableness." *Id.* at 687-88. Reviewing courts "'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' and that counsel's conduct was not the result of error or omission but derived instead from trial

strategy." *Elliott v. Williams*, 248 F.3d 1205, 1208 (10th Cir.) (quoting *Strickland*, 466 U.S. at 689), *cert. denied,* 122 S. Ct. 286 (2001).

To establish prejudice, Sallahdin must show that, but for counsel's errors, there is a reasonable probability the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* If the alleged ineffective assistance occurred during the guilt phase, the question is whether there is a reasonable probability the jury would have had reasonable doubt regarding guilt. *Id.* at 695. In answering this question, we review the totality of the evidence, not just the evidence helpful to Sallahdin. *Cooks*, 165 F.3d at 1293.

If the alleged ineffectiveness occurred during the sentencing phase, this court considers "whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. In answering this question, we keep in mind the strength of the government's case and the aggravating factors the jury found, as well as the totality of the mitigating factors that might have been presented if counsel's performance had not been deficient. *Walker*, 228 F.3d at 1234 (citing *Strickland*, 466 U.S. at 695).

*Guilt Phase* -- In light of the overwhelming evidence of guilt and his present admission of guilt, Apt. Br. at 31-32, Sallahdin argues counsel's

-37-

presentation of an innocence defense was not a reasonable strategy. Rather, Sallahdin believes counsel should have learned about the impact of steroids on Sallahdin's mental state at the time of the crime and defended based on steroid usage. If counsel had done so, Sallahdin believes the jury would have learned he was in an abnormal psychotic state at the time of the crime due to anabolic steroid use. Next, Sallahdin criticizes counsel for being unprepared at the motion *in limine* hearing and at trial, because he failed to establish the effects of steroid use. Sallahdin argues trial counsel should have presented testimony from Dr. Pope, questioned the State's expert, Dr. Call, more vigorously, and presented more of the scientific evidence available at the time of the hearing. *Id.* at 32-40.

In addition, Sallahdin appears to argue he did not know how his steroid use would affect his behavior, a sort of involuntary intoxication defense. *Id*. at 36. To invoke the defense of involuntary intoxication, the defendant must produce sufficient evidence to raise a reasonable doubt as to the voluntariness of his intoxication. Involuntary intoxication results from fraud, trickery or duress of another, accident or mistake on defendant's part, pathological condition, or ignorance as to the effects of prescribed medication. *Wooldridge v. State*, 801 P.2d 729, 734 (Okla. Crim. App. 1990) (citing Okla. Stat. tit. 21, § 153) (citation omitted). "'[I]nvoluntary intoxication is a complete defense,'" but only "'where the defendant is so intoxicated that he is unable to distinguish between right and

wrong, the same standard as applied in an insanity defense.'" *Id.* (quoting *Jones v. State*, 648 P.2d 1251, 1258 (Okla. Crim. App. 1982)). Nothing presented at trial or in the post-conviction affidavits indicates Sallahdin could not understand the nature or consequences of his acts or differentiate between right and wrong. [8] When counsel declines to present a defense for which there is no arguable basis, in law or in fact, counsel's performance is not deficient.

In addition, during the motion *in limine* hearing, trial counsel made a strategic decision not to present the steroid use evidence during the guilt phase of the trial. Sallahdin has not shown "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88. He has

---

[8] Because the trial court was not given the opportunity to rule on the admissibility of the evidence concerning the effects of steroid use on Sallahdin, for the purpose of this ineffective assistance of counsel claim, we will assume, without deciding, the steroid-use evidence was admissible during the guilt phase. Although some courts have allowed presentation of steroid-use evidence by a defendant, the defense has met with limited success. *See, e.g., United States v. Palumbo*, 735 F.2d 1095, 1097-98 (8th Cir. 1984) (rejecting diminished responsibility defense despite expert evidence showing defendant had taken heavy doses of steroids to treat medical condition); *United States v. Warren*, 447 F.2d 278, 280 (2d Cir. 1971) (taking steroid prednisone to relieve asthma in part forming basis for legal insanity defense theory, rejected by jury); *State v. Knowles*, 598 So.2d 430, 433-35 (La. Ct. App. 1992) (defense presented through expert testimony that nine-month abuse of anabolic steroids by avid weight lifter precluded specific intent for murder and removed ability to distinguish between right and wrong rejected by jury); *Boblett v. Commonwealth*, 396 S.E.2d 131, 136-37 (Va. Ct. App. 1990) (jury rejected insanity defense based on use of anabolic steroids; court instructed jury on voluntary intoxication defense based on use of steroids).

not rebutted the presumption "'that counsel's conduct falls within the wide range of reasonable professional assistance' and that counsel's conduct was not the result of error or omission but derived instead from trial strategy." *Elliott*, 248 F.3d at 1208 (quoting *Strickland*, 466 U.S. at 689).

Even if counsel's performance had been deficient, the federal district court determined Sallahdin was not prejudiced because, among other things: (1) counsel thoroughly cross-examined Dr. Call; (2) Dr. Pope's post-conviction affidavit did not indicate Sallahdin did not know the difference between right and wrong at the time of the murder; and (3) Dr. Pope's affidavit did not establish steroid use alone caused Sallahdin to commit the murder. Rather, Dr. Pope merely indicated Sallahdin may have been affected by steroid use. ROA, Vol. 1, Doc. 27 at 16-17.

Our independent review of the record verifies the district court's factual findings. The cases cited by Sallahdin concerning ineffective assistance of counsel during the guilt phase are inapposite in light of these facts. Reviewing the district court's conclusions of law *de novo*, *LaFevers*, 182 F.3d at 711, we agree with its reasoning. The steroid-use evidence would not have excused Sallahdin's commission of murder, or lessened his culpability. Therefore, Sallahdin's defense in the guilt phase of trial was not prejudiced by counsel's failure to present steroid-use evidence and nothing undermines our confidence in the jury's first-stage verdict. *Strickland*, 466 U.S. at 694.

*Sentencing Phase* -- In reviewing whether trial counsel's representation in the sentencing phase of trial was constitutionally deficient, we must first determine whether the evidence was admissible during the sentencing phase. *Lockett v. Ohio*, 438 U.S. 586 (1978) (plurality), and *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982), set the standards for admission of mitigating evidence during the sentencing phase of a capital case. Those cases require "that a capital sentencer not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record, and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Boyd v. Ward*, 179 F.3d 904, 921 (10th Cir. 1999) (quotation marks omitted), *cert. denied*, 528 U.S. 1167 (2000). Thus, the jury cannot be precluded from considering any "constitutionally relevant mitigating evidence." *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998) (citations omitted).

Consistent with these holdings, the Supreme Court has indicated "that a state court may not apply a state rule of evidence in a per se or mechanistic manner so as to infringe upon a defendant's constitutional right . . . to present mitigating evidence in a capital proceeding." *Paxton v. Ward*, 199 F.3d 1197, 1214 (10th Cir. 1999) (discussing Supreme Court cases on the issue). Thus, for example, in *Green v. Georgia*, 442 U.S. 95 (1979), the Court concluded it was constitutional error for a trial court in a capital case to mechanistically exclude

proffered mitigation evidence under a state hearsay rule, particularly when the proffered evidence bore sufficient indicia of reliability. *Id.* at 97. Likewise, this circuit and others have found constitutional errors arising out of the wholesale exclusion of proffered mitigating evidence pursuant to state evidentiary rules. *See*, *e.g.*, *Rupe v. Wood*, 93 F.3d 1434, 1439-41 (9th Cir. 1996) (concluding that the exclusion of polygraph evidence pursuant to state evidentiary rules violated a capital defendant's right to present mitigating evidence); *Dutton v. Brown*, 812 F.2d 593, 602 (10th Cir. 1987) (en banc) (concluding that constitutional error occurred when mitigating evidence was excluded in the sentencing phase of a capital case on the basis of a state witness sequestration rule).

This is not to say, however, that a trial court must admit any and all mitigation evidence proffered by a capital defendant. Review of the above-cited cases indicates that proffered mitigation evidence must be reliable and relevant to be admitted. *See*, *e.g.*, *Green*, 442 U.S. at 96 (emphasizing that "substantial reasons existed to assume" the reliability of the proffered mitigation evidence); *Paxton*, 199 F.3d at 1214 (noting that "the reliability of the excluded polygraph test was corroborated by the fact that the state relied upon it in dismissing the earlier charges against" the defendant); *see also Crane v. Kentucky*, 476 U.S. 683, 690 (1986) ("[W]e have never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of

fairness and reliability-even if the defendant would prefer to see that evidence admitted."); *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) (noting that a defendant "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence").

In his January 13, 1997, affidavit, Dr. Pope stated that, "[a]t the time of [Sallahdin's] trial in 1993, a substantial and consistent scientific literature had already accumulated, showing that anabolic steroids could cause severe psychiatric effects . . . in some individuals." Post-Conviction Addendum, App. 20 at 2. Although Pope conceded that the term "steroid rage syndrome" was "a popular term with no scientific acceptance," he stated "it was [nevertheless] well recognized in the scientific community that anabolic steroids could cause severe psychiatric effects in some individuals." *Id.*

With respect to Sallahdin in particular, Dr. Pope recognized he had no significant history of serious psychological disorders, criminal behavior or violence before using steroids. Dr. Pope further stated:

> Since 1987, when he started using [steroids], he has displayed
> characteristic psychiatric symptoms which are sometimes seen in
> individuals who are sensitive to the psychiatric effects of these
> drugs. Among specific symptoms he displayed during steroid
> exposure were manic symptoms (euphoria, irritability, grandiosity of
> delusional proportions, impaired judgment, and reckless behavior)
> and depressive symptoms during steroid withdrawal (depressed
> mood, loss of interest in usual activities, sleep and appetite

disturbance, feelings of guilt, psychomotor retardation, and pronounced suicidal impulses).  It is clear from his psychiatric history that [Sallahdin] was one of those individuals who are unusually vulnerable to the psychiatric effects of steroids, and hence liable to experience severe behavioral changes as a result.

*Id.* at 1-2.  Dr. Pope believed Sallahdin used anabolic steroids until only a few weeks, if not a few days, before the crime, and therefore "was suffering from the acute effects of steroids, or at the very minimum from the acute withdrawal effects of steroids, at the time of the crime."      *Id.* at 2.  It was Dr. Pope's opinion:

to a reasonable medical certainty, that [Sallahdin] had used anabolic steroids, and was experiencing prominent psychiatric effects from anabolic steroids at the time of the crime.  As a result [his] behavior and judgement were markedly altered from those of his normal baseline personality at the time of the crime.

*Id.* at 3.

Applying the above-outlined standards to Dr. Pope's proposed testimony, we conclude that the proposed testimony was admissible during the sentencing phase of the trial.   In short, we are persuaded that Dr. Pope's conclusions regarding the effects of anabolic steroids were based upon scientific knowledge (for purposes of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)) and thus were sufficiently reliable.  Further, the record indicates that Dr. Pope previously had been admitted to testify as an expert witness on the precise topic in three criminal trials in the states of Florida, Massachusetts, and Wisconsin.

Having concluded that Dr. Pope's testimony was admissible, we now turn to application of the *Strickland* test. The federal district court found it unnecessary to decide whether trial counsel's performance was constitutionally deficient because, in its view, Sallahdin was not prejudiced by the absence of Dr. Pope's testimony:

> First, the trial court properly excluded expert testimony regarding steroid use. Second, the steroid effects could have been viewed as an aggravating circumstance, rather than as mitigating evidence. (Citation omitted.) Use of steroids could have been viewed as an attempt by petitioner to become tough, powerful and macho, all of which support petitioner's cold-hearted domination over a weaker store clerk solely for money. This portrayal of petitioner would not evoke sympathy from a jury sufficient to overcome the aggravating circumstances. Trial counsel fully advised the jury of the difference in petitioner's personality, i.e., that he was under tremendous stress and that typically he was well-liked by his family, friends and peers. The jury merely found this insufficient to overcome the crime.

ROA, Vol. 1, Doc. 27 at 18-19. Further, the federal district court noted Sallahdin could have personally testified at the sentencing phase about the effects of steroid use, but did not. *Id.* at 19. Finally, the federal district court found that the strength of the evidence against Sallahdin, the brutality of the crime, and evidence of additional threats he made during a period of pretrial detention would have overwhelmed any mitigating effect that the steroid evidence might have brought to the deliberations. *Id.*

We are persuaded that Dr. Pope's proposed testimony is considerably stronger than the district court determined it to be. During the sentencing phase,

-45-

Sallahdin presented testimony from family members, friends, his Army commander, and correctional officers at the jail where he was confined prior to trial. Generally speaking, this evidence indicated that Sallahdin (a) had a normal upbringing, (b) experienced success academically, athletically and (at least initially) with the military, (c) did not have a prior criminal record, (d) was non-violent, (e) was perhaps undergoing marital-related stress, and (f) was a good, quiet prisoner who did not cause any problems. In our view, evidence from Dr. Pope regarding the potential of steroid use to cause severe personality changes in the user could have explained how Sallahdin could have been transformed from an allegedly mild-mannered, law-abiding individual into a person capable of committing the brutal murder with which he was found guilty. [9] In addition to mitigating Sallahdin's culpability in the crime, Dr. Pope's testimony could have specifically helped to rebut one of the two remaining aggravators found by the jury: that there was a probability Sallahdin "would commit criminal acts of violence that would constitute a continuing threat to society." Okla. Stat. tit. 21, § 701.12. If the jury believed Dr. Pope, it could well have rejected the future threat argument by concluding that Sallahdin's crimes were an aberration in the

---

[9] We disagree with the district court that Sallahdin's own testimony would have sufficed in this regard. In our view, it would have taken an expert witness such as Dr. Pope to adequately explain for the jury the psychological effects of steroid use and to further explain Sallahdin's alleged personality changes as described in Sallahdin's other anecdotal evidence.

overall context of his life that could be explained by his use of or withdrawal from steroids.  Once the effects of the steroids passed from Sallahdin's system, he arguably would no longer have represented a threat to his community.  Assuming the jury determined that Sallahdin did not represent a continuing threat, the overall balance of aggravating and mitigating factors would have been substantially altered, leaving the jury to weigh Sallahdin's mitigating evidence against a single aggravating factor.

Although we conclude there is a reasonable probability that the presentation of Dr. Pope's testimony could have altered the outcome of the sentencing phase, we are unable at this point to conclude that Sallahdin was denied his right to effective assistance of counsel and, in turn, his right to a fair trial.  Instead, Sallahdin must also demonstrate that his trial counsel's performance was constitutionally deficient, i.e., "that counsel's representation fell below an objective standard of reasonableness."  *Strickland*, 466 U.S. at 688.  As the Supreme Court noted in *Strickland*, "[t]here are countless ways to provide effective assistance in any given case," and "[e]ven the best criminal attorneys would not defend a particular client in the same way."  *Id.* at 689.  Thus, as previously noted, we must "indulge a strong presumption . . . that counsel's conduct was not the result of error or omission but derived instead from trial strategy."  *Elliott*, 248 F.3d at 1208 (internal quotations omitted).

Notwithstanding our conclusions regarding the relative strength of Dr. Pope's proposed testimony, we cannot say that presentation of a steroid-use defense was without risk of negative consequences, or was the only reasonable second-stage strategy that trial counsel could have adopted. [10] It is thus imperative to determine trial counsel's reasons, or lack thereof, for presenting Dr. Pope's testimony during the second-stage proceedings. *See Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").

Because the record on appeal is inadequate to allow us to properly conduct this inquiry, [11] we conclude it is necessary to remand this case to the district court to conduct an evidentiary hearing on the issue of trial counsel's performance.

---

[10] For example, it may have been reasonable for trial counsel, having asserted a defense of actual innocence during the first stage of trial, to have adopted a residual doubt strategy during the sentencing phase. Indeed, we note that the mitigating evidence actually presented by Sallahdin's trial counsel during the sentencing phase (e.g., Sallahdin's lack of a criminal record and his non-violent nature) was largely consistent with such a strategy.

[11] The trial record is silent regarding trial counsel's reasons, or lack thereof, for not presenting Dr. Pope. The only evidence we have on this issue is an affidavit from trial counsel that was attached to the reply brief Sallahdin filed in support of his federal habeas petition. The affidavit is extremely vague concerning counsel's reasons for not presenting Pope's testimony during the sentencing phase.

More specifically, the purpose of the evidentiary hearing will be to determine trial counsel's reasons, or lack thereof, for foregoing the use of Dr. Pope's testimony during the sentencing phase. If trial counsel made a strategic decision not to use Dr. Pope's testimony, the district court will then need to assess whether that was a constitutionally reasonable decision under the circumstances. If, however, it is established that trial counsel was neglectful, or otherwise erred, in failing to call Dr. Pope as a second-stage witness, then trial counsel's performance cannot be deemed constitutionally reasonable. In turn, Sallahdin would be entitled to federal habeas relief in the form of a new sentencing proceeding.

## CONCLUSION

After considering Sallahdin's arguments on appeal, we are not persuaded that constitutional error infected the first stage of his trial. Likewise, we reject the majority of his arguments concerning his sentence. We do, however, have concerns regarding his claim that trial counsel was ineffective for failing to present steroid-use evidence during the second stage of trial. We AFFIRM in part, and REVERSE in part, and REMAND the case to the district court for an evidentiary hearing and further proceedings consistent with this opinion.