**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 25 2002**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JOHN JOSEPH ROMANO,

        Petitioner-Appellant,

v.

GARY GIBSON, Warden, Oklahoma
State Penitentiary,

        Respondent-Appellee.

No. 00-6289

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. No. CV-98-326-R)**

---

Gloyd L. McCoy of Coyle, McCoy & Burton (Robert A. Nance of Riggs, Abney,
Neal, Turpen, Orbison & Lewis, with him on the brief), Oklahoma City,
Oklahoma, for Petitioner-Appellant.

Seth S. Branham, Assistant Attorney General (W.A. Drew Edmondson, Attorney
General of Oklahoma, with him on the brief), Oklahoma City, Oklahoma, for
Respondent-Appellee.

---

Before **SEYMOUR** , **LUCERO** , and **MURPHY** , Circuit Judges.

---

**SEYMOUR** , Circuit Judge.

---

Petitioner-appellant John Joseph Romano appeals the denial of habeas relief, *see* 28 U.S.C. § 2254, from his Oklahoma first degree murder conviction and death sentence. Romano argues, among other things, that his trial attorneys' second-stage strategy was constitutionally ineffective. We disagree, and affirm the denial of habeas relief on this and his other claims.

## I.    FACTS.

A jury convicted Romano of murdering a business acquaintance, Lloyd Thompson. [1] Thompson was a fifty-eight year old gambler with a heart condition. Romano worked for Thompson setting up card games. On July 19, 1986, Thompson's neighbors reported seeing either one or two men with Thompson. One man was changing a tire on Thompson's car. Romano admitted doing so. That tire had been flattened by two punctures made in the sidewall with a sharp object, such as a knife. After changing the tire, at least one man accompanied Thompson to his second-story apartment. Immediately thereafter, Thompson's stereo was turned up very loud and there followed a lot of loud thumping and

---

[1] This was Romano's second trial for Thompson's murder. The State had initially tried Romano together with his co-defendant, David Woodruff. The Oklahoma Court of Criminal Appeals, however, overturned their resulting first degree murder convictions and death sentences, ruling the trial court should have granted a mistrial when it became apparent that Romano's and Woodruff's defenses had become mutually antagonistic. *See Romano v. State*, 827 P.2d 1335, 1337 (Okla. Crim. App. 1992).

banging, lasting between two and ten minutes. Later, another neighbor noticed a man coming from Thompson's apartment, carrying a brown paper bag. This man got into a brown Mercury Cougar, where another man waited, and the two left hurriedly. That car was registered to Romano's girlfriend. She had let him use the car that morning.

Thompson's neighbors summoned police, who found the victim's body in his apartment. Thompson had been beaten and stabbed twenty-two times. Underneath his body, police found a broken knife blade. There was evidence a struggle had occurred, including blood found throughout the apartment's living room. That afternoon, Romano's girlfriend noticed Romano had scratches on his neck that she had not previously noticed.

Thompson was known to keep large amounts of money in his front pants pockets. However, when police found his body, Thompson's front pockets had been turned inside out and were empty. And, although he had had no money that morning, Romano turned up later that day with one thousand dollars. In fact, Romano had told his girlfriend that morning that he was going to meet David so that he could collect some money to finance a trip to Clovis, New Mexico, planned for that afternoon. David Woodruff also was seen with three hundred dollars that same afternoon. Woodruff was wearing what was positively identified as Thompson's watch.

Two sets of bloody clothes and two bloody knives, one broken, were subsequently found in a trash dumpster behind a retail store. The broken knife matched exactly the blade found under Thompson's body. At trial, both Woodruff's and Romano's girlfriends identified the bloody clothing as belonging to the two co-defendants. The blood found on all the clothes and the knives was Type A, matching the victim's blood type.

A blood spatter expert testified that the blood stains on Romano's clothes were consistent with the wearer, while in close proximity, having inflicted multiple stab wounds on a bleeding victim. The stains on Woodruff's clothes, on the other hand, were more consistent with the wearer's holding a bleeding victim, rather than stabbing him. The State surmised that the two men had attacked Thompson, stabbing him both from Thompson's front and back. Woodruff's knife blade must have broken. Woodruff then grabbed and held Thompson as Romano continued stabbing him.

Police arrested Romano that same evening in Clovis, New Mexico, for first degree murder. At the time, Romano commented that he would go to the penitentiary for sure this time. He called Woodruff from jail the next morning. This call prompted Woodruff and his girlfriend to drive around looking in trash dumpsters in the area where the bloody clothes were found.

The State charged Romano alternately with first degree malice aforethought and felony murder. The jury returned a general guilty verdict. At sentencing, the State presented evidence that Romano and Woodruff had similarly killed another Romano gambling acquaintance, Roger Sarfaty, six months before Thompson's murder. The jury found two aggravating factors: Romano had committed the murder to avoid arrest and prosecution for robbing Thompson, and Thompson's murder was especially heinous, atrocious or cruel. The jury declined to find that Romano was a continuing threat to society. After weighing the two aggravating factors with Romano's mitigating evidence, the jury sentenced him to death. [2]

The Oklahoma Court of Criminal Appeals affirmed Romano's conviction and sentence on direct appeal, and denied post-conviction relief. *Romano v. State*, 909 P.2d 92 (Okla. Crim. App. 1995), *cert. denied*, 519 U.S. 855 (1996); *Romano v. State*, 942 P.2d 222 (Okla. Crim. App. 1997).

---

[2]     In a separate trial, another jury convicted Romano's co-defendant, Woodruff, of the first degree murder of Thompson, but sentenced him to life imprisonment.

## II. STANDARDS OF REVIEW.

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Romano is entitled to relief from his death sentence only if he can show that the state court's resolution of his claims was "contrary to, or involved an unreasonable application of clearly established" Supreme Court precedent, or represented "an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d). We presume state court factual findings are correct, absent clear and convincing proof to the contrary. *Id.,* § 2254(e)(1). If the state court did not address a claim's merit, however, this court then reviews the district court's legal determinations *de novo* and its factual findings, if any, for clear error. *See Thomas v. Gibson*, 218 F.3d 1213, 1220 (10th Cir. 2000).

## III. ISSUES.

**A. *Ineffective representation at sentencing.*** Romano challenges his trial attorneys' second-stage representation. In particular, Romano complains that his own attorneys presented his sister's testimony that Romano had sexually abused her, and their siblings, for years. According to Romano, this testimony was "devastating" to his second-stage defense. Appellant's Opening Br. at 17.

**1. *Evidentiary hearing/discovery.*** Romano first asserts that the federal district court should have granted his motion for discovery and conducted

-6-

an evidentiary hearing. However, Romano failed to request an evidentiary hearing in state court. He did raise several ineffective-assistance claims on direct appeal, including this one. During that direct appeal, he requested an evidentiary hearing, but only specifically to permit him to develop evidence of his exemplary incarceration record while on death row. *See* Appellant's Direct Appeal Br. at 31. Further, although he sought a state-court evidentiary hearing in his post-conviction relief application, as well, he did so again on unrelated ineffective-assistance claims. *See* Post-Conviction Application at 2, 31. Lastly, he did not raise until these habeas proceedings one of the factual issues he now seeks to develop, that defense counsel presented the sexual-abuse testimony during sentencing despite Romano's denying its occurrence. *See* Appellant's Direct Appeal Br. at 25-32.

When, as here, a petitioner has failed to develop diligently the factual basis of his federal habeas claim in state court, 28 U.S.C. § 2254(e)(2) permits a federal evidentiary hearing only in very limited circumstances where, among other requirements, the claim relies on "a new rule of constitutional law . . ." or "a factual predicate that could not have been previously discovered through the exercise of due diligence," *id.*, § 2254(e)(2)(A). *See Williams v. Taylor*, 529 U.S. 420, 429-30, 432-34, 437 (2000); *see also, e.g., Mayes v. Gibson*, 210 F.3d 1284, 1287 n.2 (10th Cir.), *cert. denied*, 531 U.S. 1020 (2000). Romano does not

assert that this claim would fit within either § 2254(e)(2)(A) exception. Consequently, he is not entitled to an evidentiary hearing in federal court. *See Valdez v. Ward*, 219 F.3d 1222, 1230 (10th Cir. 2000), *cert. denied*, 121 S. Ct. 1618 (2001); *see also Smith v. Massey*, 235 F.3d 1259, 1275 (10th Cir. 2000), *cert. denied*, 122 S. Ct. 235 (2001), *abrogated on other grounds by Neill v. Gibson*, No. 00-6024, 2001 WL 1584819, at *8 n.5 (10th Cir. Dec. 7, 2001). Nor did the federal district court abuse its discretion in denying Romano discovery in these habeas proceedings. *See* Rule 6(a), Rules Governing Section 2254 Cases.

 **2. Merits.** To obtain habeas relief, Romano must establish both that presenting evidence that he sexually assaulted his siblings amounted to deficient performance by his attorneys and that his defense was thereby prejudiced. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Here, "[b]ecause we resolve this ineffective-assistance claim by addressing [defense counsel's] performance, we affirm the denial of habeas relief without addressing *Strickland*'s prejudice inquiry." *Bryan v. Gibson*, No. 00-6090, 2001 WL 1656579, at *10 (10th Cir. Dec. 27, 2001) (citing *Strickland*, 466 U.S. at 697).

To establish deficient performance, Romano must show that his attorneys' "representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88. "Judicial scrutiny of counsel's performance must be highly deferential . . . . A fair assessment of attorney performance requires that every

effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*; *see also Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986). To prevail, therefore, Romano must "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (further quotation omitted). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690.

Romano concedes that defense counsel pursued the "sound" second-stage strategy of portraying Romano as "a redeemed individual who deserved a punishment . . . less than death." Appellant's Opening Br. at 17-18. Essentially he complains that defense counsel went too far by eliciting Romano's sister's testimony that Romano had sexually abused her and his other siblings.

As Romano concedes, *see id.*, it was clearly the second-stage defense strategy to acknowledge what a horrible person Romano had been, but then to show that he had evolved into an individual worth sparing from death. In her second-stage opening argument, defense counsel previewed for the jury Romano's sad family background and evidence of "Romano in his teenage years,

-9-

mid 20s, he was a gambler, a drug addict, a hustler, manipulative and materialistic . . . violen[t]." Trial tr., vol. V at 943. Counsel further asserted, however, that "[y]ou will [also] hear testimony about John Romano, the man he is now, Christian, drug free, non-violent and sincere[,] who has changed. . . . [W]e hope that after you hear this you will spare his life." *Id.*

To show the person Romano had become,[3] the defense presented three jail guards who testified that Romano never questioned authority and was always a "model" prisoner, pleasant, cooperative, obedient, helpful, respectful, and a calming, cheering and positive influence on the violent offenders with whom he lived. One guard stated it was like night and day when comparing Romano to the other maximum security inmates. Another guard suggested if anything threatening were to happen to him while on duty, alone among fifty violent inmates it would be Romano who would "back up" the guard. Romano's former defense attorney testified that Romano was very open, likable, and intelligent. He was the only former client with whom she kept in contact. Six ordained and lay prison ministers testified that Romano was a devout Christian, attended

---

[3] Against this backdrop concerning who Romano currently was at the time of this trial in 1993, the jury was obviously aware of the facts regarding his murder of Thompson in 1986. Moreover, the State presented evidence that Romano and Woodruff had been convicted of robbing, stabbing, beating and strangling another Romano gambling acquaintance in 1985, fifty-two year old Roger Sarfaty.

religious services regularly and helped with Bible studies. He had a positive outlook, was very empathetic and encouraging, and had a positive influence on those who counseled him, as well as on other inmates. As one example, Romano had once successfully counseled a suicidal inmate. Because many of these witnesses were able to speak about their experiences with Romano over a five- or six-year time period, they were able to attest credibly to his sincerity.

In addition, Romano's fifteen year old brother spoke to Romano each week. He testified that Romano would counsel him to do what was right, stay away from drugs and out of trouble, and help his mother. The defense then put on Romano's mother and his sister to explain "how [his] home environment influenced his behavior, how it contributed to his attitude and the very means of his personality," *id.* at 941 (defense second-stage opening argument). His mother testified that she was seventeen when she married Romano's father, who was then eighteen. The couple had four children in their marriage's first five years. She described Romano's father as controlling and cruel, referring to her frequently as a whore, pig and white trash. She had to protect the children from their own father, who was physically abusive and hard on the children, especially Romano, who was the eldest. For example, Romano's father severely beat him when Romano was unable to ride a bike on the first try.

The couple fought constantly. They eventually divorced after being married for fifteen years. Romano had himself begged them to divorce. Their divorce was fraught with years of litigation and battles over the children and the marital property.

Romano's mother asserted she had had at least five "nervous breakdowns," beginning when she was twenty-one. She had tried to kill herself in front of her children by jumping out of a moving car. She had also once taken a Valium overdose, after which her husband refused to allow her to go to the hospital. She was currently undergoing counseling. She further testified that Romano had a drug addiction, and her oldest daughter had, at one time, been on speed. That daughter had undergone one and one-half years of therapy, plus marriage counseling. Another daughter was anorexic, weighing only eighty pounds, and had to live with a psychiatrist for treatment.

Amidst all of this mitigating evidence, the defense presented the testimony of Romano's thirty-two year old younger sister. She testified that her parents married young, fought constantly, and separated several times before finally divorcing. Their family life was violent. "It was hitting and screaming and constant[]." *Id.*, vol. VI at 1166. Her father would encourage his children to fight physically, hitting and punching. He would spank them until they could not stand. Her mother was depressed all the time and had tried to kill herself in front

of the children, once by trying to jump out of a moving car and on another occasion by trying to shoot herself.

After the divorce, her mother worked three jobs to support the family, often leaving her five children unattended. Romano must have been about fourteen at the time of the divorce; this witness was twelve. They would see their father only about once a month, and they would go weeks without seeing their mother except to get her up as they left for school.

Romano was left in charge of the children. His sister described him as "very, very mean." *Id.* at 1165. He would physically beat the other children "all the time." *Id.* It is during this discussion that his sister testified that Romano

> . . . sexually abused my sister and I for . . . as long as I can remember. I don't remember when it started. And . . . actually my little brother too.
>
> The youngest I can remember that it definitely was going on was at least second grade, which I would have been seven or eight years old and I just don't remember it starting, but I do remember it then.
>
> . . . .
>
> . . . it stopped when I was 12.
>
> . . . .
>
> I hated him. I felt like he ruined my life. I felt like he took something away from [me] that I didn't even know I had to offer.

*Id.* Consonant with the defense strategy, however, Romano's sister further testified that her relationship with her brother had changed: "I've forgiven him. And because of that I talk to him. I talk to my kids about him, and I care about him. I love him now." *Id.* at 1166.

There is no question that the defense strategy specifically included presenting this sexual-abuse testimony. Defense counsel clearly referred to it in her second-stage opening statement. The question presented here is not whether counsel's decision to present this testimony was strategic, but whether that strategy was reasonable. *See Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000); *see also Burger v. Kemp*, 483 U.S. 776, 789 n.7 (1987). "For counsel's actions to rise to the level of constitutional ineffectiveness, [this] strategic decision[] must have been completely unreasonable, not merely wrong, so that [it] bear[s] no relationship to a possible defense strategy." *Fox v. Ward*, 200 F.3d 1286, 1296 (10th Cir.) (further quotations omitted), *cert. denied*, 531 U.S. 938 (2000).

In denying relief, the Oklahoma Court of Criminal Appeals, applying *Strickland,* held that Romano's sister's testimony "effectively illustrated" Romano's "transformation . . . from a victimizer to a born again Christian." *Romano*, 909 P.2d at 126, 127.

> The jury was fully aware [Romano] had behaved abhorrently in the past and was violent. Any damage her testimony could have caused would be to emphasize [Romano] was a continuing threat, an aggravating circumstance not found by the jury. On the contrary, her

-14-

testimony added to the proof [Romano] was no longer a threat to society.

*Id.* at 127.

The state appellate court's decision denying relief was not unreasonable. *See* 28 U.S.C. § 2254(d)(1). Although Romano argues on appeal that defense counsel should never have called Romano's sister to testify at all, in fact her testimony generally was key to the defense strategy. Through her, the defense presented much of the family's sad history, explaining to some degree, perhaps, how Romano had become the person he had. No other witness offered all of this same information.

The sexual-abuse testimony, in particular, reinforced the defense strategy. Romano had been a mean, violent person, capable of horrific behavior. But the sister's testimony supported the defense theory that Romano was now a changed man, dramatically emphasizing that his sister had been able to forgive him and did love him. This appears to be exactly what the defense attorneys were hoping the jury would also do -- look beyond his horrible crimes and sentence the person Romano had become to a sentence less than death. In fact, defense counsel argued in closing:

> don't you think a woman who has suffered like that, who has reason
> to hate that man for violating her body like that, if she can forgive
> that brother for that kind of harm, can't you spare his life, a man you
> have never met. A man who has never caused you any personal
> trauma.

Trial tr., vol. VI at 1232.

"There are countless ways to provide effective assistance in any given case[,]" and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689; *see also, e.g., Sallahdin v. Gibson*, No. 99-6361, 2002 WL 12273, at *21 (10th Cir. Jan. 4, 2002); *Bryan*, 2001 WL 1656579, at *14. "[A]nd it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689. In light of all the circumstances, *see Morrison*, 477 U.S. at 384, we cannot say that defense counsel's strategic decision to present this testimony was "completely unreasonable," *Gonzales v. McKune*, 247 F.3d 1066, 1072 (10th Cir. 2001), *reh'g en banc granted on other grounds*; *see also Morrison*, 477 U.S. at 382 (noting only those habeas petitioners whose attorneys' "gross incompetence" has denied them a fair trial are entitled to habeas relief).

**B.     Evidence supporting "avoid arrest" aggravator.**     The State charged, and the jury found, that Romano had killed Thompson to avoid being arrested or prosecuted for robbing him. Romano contends the evidence does not support the jury's determination.

The relevant habeas inquiry here is whether, viewing the evidence in a light most favorable to the State, there was sufficient evidence for any rational

fact finder to find this aggravating factor beyond a reasonable doubt. *See LaFevers v. Gibson*, 182 F.3d 705, 723 (10th Cir. 1999) (applying *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see also, e.g., Sallahdin*, 2002 WL 12273, at *12. The state appellate court determined there was. *See Romano*, 909 P.2d at 119. That determination was not unreasonable. *See* 28 U.S.C. § 2254(d). [4]

Under Oklahoma law, this aggravator focuses on the defendant's intent, which can be proven either through his own statements or circumstantial evidence, and additionally requires proof of a predicate crime, other than the murder, for which the defendant seeks to avoid arrest or prosecution. *See, e.g., Romano v. Gibson*, 239 F.3d 1156, 1179 (10th Cir.), *cert. denied*, 122 S. Ct. 624, 628 (2001). The evidence established that Romano and his girlfriend needed cash for their New Mexico trip. Romano worked for Thompson and knew he always carried large amounts of cash in his front pants pockets. Police found Thompson's body with his front pants pockets turned inside out and empty. Later that day, Romano had one thousand dollars with him that he did not have earlier that morning. In addition, his co-defendant Woodruff had three hundred dollars and was wearing Thompson's watch. This evidence was sufficient to

---

[4] This court has not resolved whether this state court determination is factual, reviewed under § 2254(d)(2) and (e)(1), or a mixed question of law and fact, reviewed under § 2254(d)(1). *See Hale v. Gibson*, 227 F.3d 1298, 1335 n.17 (10th Cir. 2000), *cert. denied*, 121 S. Ct. 2608 (2001); *see also, e.g., Sallahdin*, 2002 WL 12273, at *12 n.6. Romano would not be entitled to habeas relief under either standard. *See, e.g., Sallahdin*, 2002 WL 12273, at *12 n.6.

support the jury's finding this aggravating factor beyond a reasonable doubt. *See, e.g., Romano*, 239 F.3d at 1179 (reviewing, under AEDPA, reasonableness of state court's denying similar claim); *Hale*, 227 F.3d at 1334-35 (reviewing similar claim *de novo*).

**C.** **Evidence supporting especially heinous, atrocious or cruel aggravating factor.** Romano also asserts there was insufficient evidence to support the jury's finding that Thompson's murder was especially heinous, atrocious or cruel. This issue is not properly before us.

Neither the district court nor this court ever granted Romano a certificate of appealability (COA) on this issue. *See* 28 U.S.C. § 2253(c). The district court denied him COA on this claim, and Romano did not renew that COA request in this court. Nonetheless, our case management order provided Romano ten days from its date, October 18, 2000, to seek COA from this court on any additional issues. Such a request "must be raised by written motion." Romano still failed to request COA on this particular claim. The case management order further specifically provided that "[u]nless otherwise ordered by the merits panel, no issue shall be included in the briefs other than those set forth" in that order. Because Romano never properly sought and obtained COA on this issue, it is not properly before this court.

-18-

Even if we were to grant COA and consider this claim's merit, we would deny habeas relief. The state appellate court's determination that there was sufficient evidence to support this aggravator, *see Romano*, 909 P.2d at 118-19, was reasonable, *see* 28 U.S.C. § 2254(d).

**D.    *Evidentiary rulings.*** In conclusory fashion, Romano challenges the cumulative effect of improperly admitted evidence. *See* Appellant's Opening Br. at 66-68. Romano challenges the blood spatter expert's testimony; the co-defendant's girlfriend's hearsay testimony; the trial court's admitting six gruesome photographs; the prosecutor's hypothetical question about ligature marks found on Woodruff's and Romano's other murder victim, Roger Sarfaty; and a detective's "comment on [Romano's] silence,"[5] *id.* at 67. Romano's perfunctory discussion of these issues on appeal to this court alone warrants denying habeas relief. *See, e.g., Walker v. Gibson*, 228 F.3d 1217, 1239-40 (10th Cir. 2000) (declining to address conclusory and unsupported argument), *cert. denied*, 121 S. Ct. 2560 (2001), *abrogated on other grounds by Neill*, 2001 WL 1584819, at *8 n.5; *see also Sallahdin*, 2002 WL 12273, at *12 (noting this court need not address undeveloped argument). Moreover, these evidentiary claims, considered separately or together, did not result in a fundamentally unfair

---

[5]    Romano asserts only that the detective's comment deprived him of a fair trial. *See* Appellant's Opening Br. at 67.

trial. *See, e.g., Estelle v. McGuire*, 502 U.S. 62, 67-68, 70 (1991); *Elliott v. Williams*, 248 F.3d 1205, 1214 (10th Cir.) *cert. denied*, 122 S. Ct. 286 (2001).

## IV.    *CONCLUSION*

For these reasons, we AFFIRM the denial of habeas relief.