**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

MARIAMMA J. PHILIPOSE,

    Defendant-Appellant.

No. 04-6240
(D.C. No. CR-02-124-T)
(D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **HENRY**, **HOLLOWAY,** and **LUCERO**, Circuit Judges.

Mariamma Philipose appeals the district court's denial of her § 2255 habeas petition. She argues that she was denied effective assistance of counsel in connection with her decision to plead guilty to making a false statement to obtain federal employee's compensation. Because her counsel's performance did not fall below an objective standard of reasonableness, we **AFFIRM** the district court's decision denying Philipose habeas relief.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

## I

Philipose severely injured her back while working as a nurse at the V.A. Hospital. On July 6, 1980, Philipose attempted to lift a patient out of bed when she lost her balance and struck her back against a wall heater. Increasing pain and a failed back surgery forced her to work only sporadically until 1984, when Philipose's doctors determined that she was no longer able to work at all. Philipose subsequently endured three more failed surgeries, after which her primary treating physician determined that she "could not stand, walk, or sit, without some change in position, for more than 20 to 30 minutes at a time," and that Philipose "could not lift, bend or stoop." As a result of her total disability stemming from a personal injury incurred while performing duties as a federal employee, Philipose collected compensation from the United States government.

Dr. Wade McCoy, a family practitioner, began treating Philipose for her constant pain. He became increasingly concerned with Philipose's mental health, as Philipose reported suffering from suicidal ideation. In response, Dr. McCoy recommended that Philipose "try to be with family as much as possible . . . that she be in the store, that she owns a retail shop in Bethany, if possible, that she go to the store and, at least for part of the day, be there in the store . . . ." Philipose and her husband owned two stores located on the same street and, in response to Dr. McCoy's recommendation, Philipose began spending time in these establishments.

Suspecting that Philipose was performing some duties at her family's stores, the FBI and the U.S. Department of Labor Office of Inspector General launched an undercover operation in March 1998. The record reveals that on July 7, 1998, an undercover law enforcement officer purchased a pair of "scrub pants" from Philipose, that a series of undercover agents posed as customers over a one-year period, and that Philipose "had helped several agents who had come to the store."

On May 4, 1999, Philipose filled out Form 1032. By completing and sending this form to the Department of Labor ("DOL"), benefits recipients comply with federal regulations requiring them to disclose to the DOL any employment compensation they have received. Philipose truthfully reported that she had not received any compensation. Form 1032 also requires disclosure of any employment, self-employment, volunteer work, and any involvement in a business enterprise for the preceding fifteen months. Philipose indicated on Form 1032 that she had not performed any work over the covered period of time.

In January 2000, four federal agents appeared at one of Philipose's stores. Two agents took Philipose aside for questioning and the other two agents began questioning a store employee. According to the employee's affidavit, she felt "very threatened" by the agents' questioning. For example, after the employee stated that Philipose's husband, and not Philipose, managed the store's accounts and deposited money in the bank, the agents allegedly said: "You had better be careful because Mary is in serious trouble and you don't want to get into serious

-3-

trouble by lying" and "we have been watching her for a long time and today we watched her walk between the uniform store and the clothing store." The employee acknowledged that on occasion, Philipose "rang up a sale or sacked clothes." In response to questioning by the other two agents, Philipose admitted that she occasionally completed sales at a cash register, drove from the store to her house, and made bank deposits for the stores.

Aware that she was the subject of a serious federal criminal investigation, Philipose retained Mark Blasdel as counsel. Blasdel had extensive experience as a state prosecutor and criminal defense attorney. He met numerous times with Philipose and extensively reviewed her medical history and the facts surrounding her activities at the stores. Blasdel interviewed Philipose's husband and store employees. After securing affidavits from the employees, he submitted them to the U.S. Attorney's Office in advance of several meetings that he had with prosecutors to discuss the investigation. He also provided prosecutors with Philipose's medical records and letters from physicians, and on one occasion brought one of Philipose's treating physicians with him to meet with prosecutors. Blasdel presented a compelling case to the U.S. Attorney's Office that Philipose was functionally incapable of working at her family's stores.

Despite Blasdel's efforts, prosecutors informed him that they were contemplating filing four felony charges against Philipose. Blasdel entered plea negotiations and secured an offer from the government that would allow Philipose

to plead guilty to a single misdemeanor charge – making a false statement to obtain federal employee's compensation.  18 U.S.C. § 1920.  After receiving the government's offer, Blasdel met for several hours on numerous occasions with Philipose, her husband, and her son (a chiropractor) to discuss the possibility of pleading guilty.  They discussed the facts of the case, possible defenses, the risk of trial, and the benefits and detriments of pleading guilty to the misdemeanor.  As a result of these conversations, Philipose decided to accept the plea offer.

With the assistance of Blasdel, Philipose completed a Petition to Enter a Plea of Guilty.  On this form, Philipose answered that she has "been under the care of a doctor or under treatment for a mental or emotional condition," and elaborated that she was being treated for "pain management."  She represented that she had enough time to speak with Blasdel about her case and that she was satisfied with his representation.  She indicated an understanding of the rights that she was waiving by pleading guilty and of the sentence exposure that she faced.  In her own words, she stated that she "did the act charged," specifically representing:  "I made a statement on the Federal Workers Compensation form that I was not working when I was."

During the plea colloquy before the district court, Philipose stated that she had consulted with Blasdel to her satisfaction about the consequences of pleading guilty.  She indicated an understanding of her right to a jury trial and a right to indictment and waived those rights.  After approving the waiver of her jury trial

and indictment rights, the court began to question her about the factual basis for her plea. Philipose affirmed that the statements on her Petition to Enter a Plea of Guilty were her own words. To further satisfy itself that there was a factual basis for the plea, the court asked the prosecution to question Philipose under oath. In response to the prosecution's inquiries, Philipose affirmed that she had denied on Form 1032 having worked in the preceding fifteen months, that she was in fact "doing work in that 15 month period," that her "answer was false on the form," that she "knew that it wasn't true and . . . signed it knowing it wasn't true," and that she did so knowingly and willfully. The court accepted her guilty plea. At sentencing, Blasdel spoke effectively on Philipose's behalf and requested that the court impose the most lenient sentence available. The court agreed and sentenced Philipose to a two-year term of probation and ordered her to make restitution to the government.

Although Philipose did not directly appeal her sentence, she retained new counsel and timely filed a 28 U.S.C. § 2255 petition to vacate, modify, or set aside her sentence, arguing that she received ineffective assistance of counsel in connection with the entry of her plea. The government sought summary dismissal of the petition, arguing that the plea agreement into which Philipose entered contains an express waiver of the right to appeal or to collaterally attack the plea. The plea agreement specifically provides: "defendant in exchange for the promises and concessions made by the United States in this plea agreement,

-6-

knowingly and voluntarily waives her right to appeal or collaterally challenge Defendant's guilty plea and any other aspect of her conviction, including but not limited to any rulings on pretrial suppression motions or any other pretrial dispositions of motions and issues." Because Philipose attacked her plea on the basis of ineffective assistance of counsel, the court denied the government's motion relying on our ruling that "a plea agreement waiver of postconviction rights does not waive the right to bring a § 2255 petition based on ineffective assistance of counsel claims challenging the validity of the plea or the waiver." United States v. Cockerham, 237 F.3d 1179, 1187 (10th Cir. 2001).

The court proceeded to consider Philipose's claim that she was denied effective assistance of counsel. At a hearing on the matter, Philipose presented testimony from Dr. McCoy and from Gene Hawkins, a psychologist and pain management specialist who treated her at the time of her plea. Dr. McCoy testified that he had no contact with Blasdel during the time that he represented Philipose. He further stated that at the time Philipose entered her plea, "her ability to make a rational decision and understand the consequences of that decision were greatly impaired." Hawkins testified that McCoy referred Philipose to him for treatment in February 2002, three months before Philipose agreed to plead guilty. He diagnosed her as suffering from posttraumatic stress disorder, a condition which left her with "an indifference about life and what's going to happen to [her]." In response to the question, "would you treat with some suspicion or

skepticism her having entered a knowing, voluntary, and rational decision to enter a plea in this case," Hawkins answered, "I would."

Blasdel testified about the course of his representation of Philipose. He stated that he had no problem communicating with her and although she often was in pain during their meetings, "she wasn't totally preoccupied with her pain." In his view, Philipose understood the risks of proceeding to trial and the costs and benefits of pleading guilty. During their conversations "she was on little, if any, medication, maybe minimal medication." Although Philipose informed Blasdel that she was being treated by a psychologist for pain management, Blasdel never perceived her level of pain as rendering her incompetent. He emphasized several times in his testimony that he never suspected that she was incompetent to proceed with a guilty plea.

On consideration of the evidence, the district court denied Philipose's § 2255 petition. The court found that Blasdel diligently investigated Philipose's defense and "consistently offered effective assistance." Moreover, given that neither Philipose, her husband, nor her son ever "suggested that her pain level affected her ability to think rationally or her competency to make decisions," that neither Dr. McCoy nor Hawkins "raised any question or concern on her behalf" despite their knowledge that she was facing federal criminal charges, and that Blasdel consistently considered Philipose's communication and demeanor as consistent with competence, the court found that "[t]he evidence does not support

defendant's claim that Mr. Blasdel should have contacted Dr. McCoy and Dr. Hawkins prior to discussing the plea agreement with the defendant." Based on these findings, the court ruled that Blasdel provided Philipose with effective assistance. Having rejected Philipose's ineffective assistance of counsel claim, the court did not rule on whether Philipose was incompetent to enter a plea of guilty. The district court denied Philipose's application for a certificate of appealability ("COA"), concluding that "her claim of ineffective assistance of counsel does not satisfy the standards and requirements of Strickland v. Washington, 466 U.S. 668 (1984); reasonable jurists could not debate that conclusion."

Her application for a COA having been denied below, Philipose sought a COA from this court. We granted a COA "on the two issues . . . pertaining to ineffective assistance of counsel," namely whether Philipose "was denied effective assistance of trial counsel in connection with the plea agreement both because counsel failed to consult her doctors regarding her competency and because the evidence in the case overwhelmingly demonstrated that she was not guilty." These are the sole issues before us: (1) did Blasdel render ineffective assistance by failing to consult with Philipose's doctors regarding her competency and (2) did Blasdel render ineffective assistance by pressuring Philipose to plead guilty even if overwhelming evidence demonstrated that she was not guilty?[1]

---

[1] Philipose's petition was filed after April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"); as a result,

-9-

## II

On appeal of the denial of habeas relief, this court reviews factual findings for clear error and legal determinations de novo. Romero v. Tansy, 46 F.3d 1024, 1028 (10th Cir. 1995). To prevail on her ineffective assistance of counsel claim, Philipose must prove that Blasdel's representation fell below an objective standard of reasonableness and that his deficient representation prejudiced her defense. Strickland v. Washington, 446 U.S. 668, 687-88 (1984). "There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Romano v. Gibson, 278 F.3d 1145, 1151 (10th Cir. 2002) (quotation omitted). Philipose argues that Blasdel rendered ineffective assistance in two ways: by failing to contact her doctors to inquire into her mental state and by pressuring her to plead guilty in order to "dump the case." After careful review of the record, we have determined that Blasdel's representation did not fall below an objective standard of reasonableness.

Because Phillipose indicated on her Petition to Enter a Plea of Guilty that she has "been under the care of a doctor or under treatment for a mental or emotional condition," and elaborated that she was being treated for "pain

---

AEDPA's provisions apply to this case. See Rogers v. Gibson, 173 F.3d 1278, 1282 n.1 (10th Cir. 1999) (citing Lindh v. Murphy, 521 U.S. 320 (1997)). AEDPA conditions a petitioner's right to appeal a denial of habeas relief under § 2255 upon a grant of a COA. 28 U.S.C. § 2253(c)(1)(B). Although Philipose seeks to argue on appeal that her plea was invalid because she was incompetent to enter a plea of guilty, we have not granted a COA on that issue.

management," she argues that it constituted ineffective assistance for Blasdel not to contact her psychologist to inquire into her competency to plead guilty. We disagree.[2] Blasdel encountered a client who was well educated and demonstrated no difficulty in communicating with him about the case or the decision to plead guilty. He met with her, her husband, and her son numerous times and clearly explained the process of entering a guilty plea and the details of the plea agreement. At no point did anyone, including Philipose's doctors or her chiropractor son, express to Blasdel a concern over Philipose's competence. Philipose herself supplied the answers in the petition and indicated on several occasions that she understood the implications of pleading guilty and desired to do so. Philipose was on little or no pain medication during her meetings with Blasdel, and although Blasdel perceived that she was in pain, the pain never seemed to distract her from their conversation. Given this context, the mere fact that Philipose informed Blasdel that she was being treated for pain management

---

[2] Philipose cites to McLuckie v. Abbott, 337 F.3d 1193, 1199 (10th Cir. 2003), for the proposition that "[w]here a lawyer has actual or constructive knowledge of the mental state of his client, he has a duty to investigate." Appellant's Br. at 11. McLuckie does not stand for such a broad proposition. Rather, McLuckie held that counsel rendered ineffective assistance in a first-degree murder case by failing to investigate and present a mental health defense to the crime charged where there was significant evidence that the defendant lacked the requisite mens rea. McLuckie's holding is irrelevant to the question presented in this case.

-11-

did not impose on him a duty to seek an expert opinion as to her competence to plead guilty.[3]

Philipose also argues that Blasdel "had become tired of the case or had an aversion to committing himself to the total representation of this person's interests and was looking to 'dump the case.'" Appellant's Br. at 13. She asserts that Blasdel possibly recognized "the psychologic problems of his client and chose to simply ignore them" because "if he discovered that she was not able to enter a plea then his 'dump the case' plan would have been derailed." Id. In sum, she argues

---

[3] The record contains no evidence that at the time she pled guilty, Philipose exhibited signs of legal incompetence such that Blasdel should have suspected that his client lacked sufficient competency. "[T]he test of mental competency at the time of trial or the entering of a plea in a criminal case is whether the accused 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him.'" Fields v. Gibson, 277 F.3d 1203, 1215 n.7 (10th Cir. 2002) (quoting Dusky v. United States, 362 U.S. 402, 402 (1960)). "The presence of some degree of mental disorder in the defendant does not necessarily mean that he is incompetent to knowingly and voluntarily enter a plea . . . ." Miles v. Dorsey, 61 F.3d 1459, 1472 (10th Cir. 1995) (quotation omitted). Although Dr. McCoy testified that at the time Philipose entered her plea, "her ability to make a rational decision and understand the consequences of that decision were greatly impaired" and Hawkins agreed with the statement that he would "treat with some suspicion or skepticism her having entered a knowing, voluntary, and rational decision to enter a plea in this case," this testimony does not demonstrate that Philipose lacked the ability to consult with Blasdel with a reasonable degree of rational understanding or that she lacked a rational understanding of the proceedings against her. See, e.g., Dorsey, 61 F.3d at 1474 ("Petitioner's history of mental problems, low intelligence, psychotropic medication, and substance abuse do not establish that he was incompetent to plea.").

-12-

that Blasdel was not committed to representing Philipose and pressured her to plead guilty to terminate the representation.

The record, however, paints a very different picture. Blasdel conducted a thorough investigation of the case, including meeting with Philipose, her family, and store employees. Following extensive interviews with store employees, he secured affidavits from them that he submitted to the government. He combed through Philipose's voluminous medical records and presented compelling evidence to the government that Philipose was incapable of working. To supplement this evidence, he brought one of her treating physicians with him during one of his many meetings with the U.S. Attorney's Office. When it became apparent that the government would go forward with the prosecution on four felony counts, Blasdel negotiated a plea to a one count misdemeanor charge. Although Blasdel had amassed significant evidence to defend his client at trial, there was a real possibility that Philipose would be convicted based on the evidence yielded by the government's undercover operation and its interviews with Philipose and store employees. Under the circumstances, it was not unreasonable for Blasdel to explore a plea agreement with his client. See Strickland, 466 U.S. at 689 ("Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable").

He met extensively with Philipose and her family to discuss the plea agreement, and Philipose repeatedly stated under oath – both in written form and

orally – that she understood the implications of pleading guilty, that she committed the crime charged, and that she was satisfied with Blasdel's representation of her. At sentencing Blasdel gave an impassioned defense of his client and helped secure a sentence of probation. The record clearly demonstrates that Blasdel's representation did not fall below an objective standard of reasonableness. Id. at 687.

In reaching this conclusion, we do not implicate the government's decision to target Philipose for investigation or its decision to prosecute her. We merely hold that in not gambling with a four count felony indictment, and in obtaining for his client an agreement from the government to accept a plea to a single misdemeanor charge and no incarceration, Philipose's attorney did not render ineffective assistance.

### III

Because Philipose has failed to show that Blasdel's representation fell below an objective standard of reasonableness, we conclude that she did not receive ineffective assistance of counsel in connection with her plea of guilty. We **AFFIRM** the decision of the court below denying Philipose's § 2255 motion and **DISMISS** this appeal.

ENTERED FOR THE COURT

Carlos F. Lucero
Circuit Judge

No. 04-6240, *United States v. Philipose*
**HOLLOWAY,** Circuit Judge, dissenting**:**

I respectfully dissent. The Order and Judgment of the majority thoroughly discusses the evidence and authorities pertaining to the ruling on appeal, the denial of Defendant Philipose's motion under 28 U.S.C. § 2255 to set aside her plea and sentence. The basic issue raised by this appeal from that ruling is whether the Defendant was denied the constitutionally guaranteed effective assistance of counsel. I must disagree with the majority's conclusion that Defendant received effective assistance of counsel.

The longstanding test for determining the validity of a guilty plea is "whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the Defendant."[1] *North Carolina v. Alford*, 400 U.S. 25, 31 (1970); see *Boykin v. Alabama*, 395 U.S. 238, 242 (1969); *Machibroda v. United States*, 368 U.S. 487, 493 (1962). The Defendant asserts that her guilty plea was not a voluntary and intelligent choice because she lacked the competency to make the rational decision necessary to enter into the plea. Defendant's counsel failed to investigate her mental health status despite his knowledge of seriously disturbing circumstances about Defendant's mental health.

---

[1] Although this court has not granted a Certificate of Appealability (COA) on the issue of whether Defendant's plea was invalid because she was incompetent, Defendant's competency is directly relevant to the issue on which we have granted a COA: whether she received ineffective assistance of counsel. This is because even if counsel's performance fell below an objective standard of reasonableness, Defendant would not be prejudiced unless she indeed lacked competency at the time she entered into the plea.

I am convinced that Defendant demonstrates that she received ineffective assistance of counsel due to counsel's failure to properly investigate her mental status before conferring with her as to the advisability of entering a guilty plea.

It is uncontroverted that Defendant's then counsel, Mr. Blasdel, knew that Defendant was under the care of a psychologist at the time Defendant entered into the plea agreement. Defendant's psychologist, Doctor Hawkins's, name was written in the change of plea petition. *See* Transcript of April 29, 2004 proceedings at 51. In response to Question 5 in the form which asks "Have you ever been under the care of a doctor or under treatment for a mental or emotional condition?," the answer "yes" was marked. *Id*. Counsel also knew that Defendant had been under the care of Doctor McCoy, Defendant's then treating general physician. Counsel admitted on cross examination that he was aware of the existence of Doctor McCoy and a document from the Oklahoma Diagnostic Imaging Company, which was reviewed by counsel, shows Doctor McCoy's name as the referring physician. *Id*. at 58. Doctor McCoy had referred Defendant to Doctor Hawkins because of concern about Defendant's suicidal tendencies. Despite his knowledge that Defendant was being treated by Doctors McCoy and Hawkins, counsel did not make any effort to contact these health care professionals or to receive any medical information from them.

In representing Defendant in the underlying case, counsel contacted and reviewed medical evidence from some of Defendant's physicians.[2] However, he did not contact or review medical evidence from Doctors McCoy and Hawkins. We, therefore, must decide whether it was reasonable for counsel to fail to contact these health care professionals before conferring with the Defendant on the advisability of entering a plea of guilty.

As the majority notes, there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Romano v. Gibson*, 278 F.3d 1145, 1151 (10th Cir. 2002). However, the presumption is not an absolute bar to a finding of ineffective assistance of counsel. A Defendant can sustain a claim of ineffective assistance of counsel if she is able to prove: (1) that counsel's representation fell below an objective standard of reasonableness, and (2) that counsel's deficient representation prejudiced her defense. *See Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). At the same time, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id*. at 691. In *Strickland*, the Supreme Court considered a similar claim as the one here. Defendant claimed

---

  [2] The record shows that counsel reviewed medical evidence from Doctors Brent Tipton and Nathan Bradley who apparently at different times had treated Defendant. *Id*. at 43. Counsel also reviewed medical evidence from Doctor Jeff Pardee, the federal workers compensation doctor that reviewed Ms. Philipose's condition. *Id*.

ineffective assistance of counsel because counsel did not seek more character or psychological evidence than was already before the trial court. The Court rejected Defendant's claim because it found that "counsel made a strategic choice to argue for the extreme emotional distress mitigating circumstance and to rely as fully as possible on [Defendant's] acceptance of responsibility for his crimes." *Id*. at 699. The Court held that trial counsel could reasonably surmise from his conversations with Defendant that character and psychological evidence would be of little help. *Id*. "Restricting testimony on [Defendant's] character to what had come in at the plea colloquy ensured that contrary character and psychological evidence and [Defendant's] criminal history, which counsel had successfully moved to exclude, would not come in." *Id*. As a result, the Court concluded that trial counsel's defense was the result of reasonable professional judgment.

In the present case, it would be reasonable for counsel not to contact Doctors McCoy and Hawkins if it was not necessary to contact them or the decision not to do so was the result of a strategic choice. There is, however, no evidence in the record to show that it was either unnecessary for counsel to contact these health care professionals or that counsel made a strategic choice not to do so.

Doctor McCoy advised Defendant to spend some time in the family store because of his concern about Defendant's suicidal ideation. *See* Transcript of April 29, 2004 proceedings at 26. Since Defendant was charged because of her alleged work in the family store, it would seem necessary for counsel to have

-4-

contacted Doctor McCoy to understand the basis for his advice to Defendant. Similarly, nothing in the record suggests that it was not necessary for counsel to contact Doctor Hawkins after he knew that Defendant was being treated by Doctor Hawkins for a mental health condition. On the contrary, it appears that counsel did not pay attention to the implication of his client being treated by a psychologist for a mental health condition.[3] By the time of the underlying plea proceedings in this case, Defendant's condition had progressed beyond mere physical illness and pain to psychological and mental problems.[4] Had counsel contacted Doctor McCoy or Doctor Hawkins he would have discovered this fact casting doubt on Defendant's competency to enter into a plea.

In addition, counsel's failure to contact these health care professionals did not result from a strategic choice. Nothing suggests that evidence from Doctor

---

[3] Although Defendant provided information to counsel that she was being treated by Doctor Hawkins for a mental health condition, counsel did not seek to know more about Defendant's mental health status from Defendant. On direct examination during the § 2255 evidentiary hearing, counsel, Blasdel, stated that he did not feel that Defendant's pain management could affect Defendant's competence even after he knew that Defendant was being treated for a mental health condition. Transcript at 51. This suggests that Blasdel's failure to contact Doctor Hawkins did not result from due consideration of the importance of this fact.

[4] The majority opinion misses this point and concentrates on counsel's initial conduct in reviewing the medical evidence from some of Defendant's doctors. The opinion fails to articulate why counsel's knowledge that Defendant was being treated for a mental health condition at the time of the plea proceedings should not have raised counsel's curiosity and interest to investigate Defendant's mental health status.

McCoy or Doctor Hawkins could have been harmful to Defendant's underlying case. Indeed, as mentioned above, counsel did not know the evidence they had and whether the evidence could have assisted or prejudiced Defendant's case. Moreover, neither Defendant nor her relatives suggested to counsel that it was unnecessary to contact these health care professionals.[5] In short, despite his

_____

[5] Counsel's conduct may be reasonably influenced by the actions or statements of a client. In *Strickland*, the Supreme Court noted:

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of
> counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

*Strickland* at 691 (internal citations omitted). In the present case, nothing suggests that Defendant led counsel to believe that it was unnecessary to contact Doctor McCoy or Doctor Hawkins. Nor is there any evidence to suggest that Defendant gave counsel reason to believe that it would be fruitless to contact the doctors or that information from them would be detrimental to her case.

The majority asserts that counsel thoroughly investigated Defendant's case. However, this is not supported by the record. Although counsel reviewed the records of some of Defendant's physicians, he did not contact Doctors McCoy and Hawkins who were at the time treating Defendant for both pain and mental

knowledge of these medical professionals, counsel unreasonably failed to contact them.

The majority concludes that Defendant did not receive ineffective assistance of counsel because counsel's performance did not fall below an objective standard of reasonableness. However, the majority provides no explanation why counsel's duty to investigate in this case was unnecessary or the result of a strategic choice. Instead, the majority asserts that Defendant failed to apprise counsel of the details of her mental status, notwithstanding that counsel was aware that Defendant was being treated for a mental health condition. According to the majority:

> Blasdel encountered a client who was well educated and demonstrated no difficulty in communicating with him about the case or the decision to plead guilty. He met with her, her husband, and her son numerous times and clearly explained the process of entering a guilty plea and the details of the plea agreement. At no point did anyone, including Philipose's doctors or her chiropractor son, express to Blasdel a concern over Philipose's competence.

*See* Order and Judgment at 11. The majority therefore implies that a Defendant has the duty to inform counsel of the details of Defendant's mental status, even though such information could easily be gathered from Defendant's mental health professional.

---

health problems. More importantly, his omission of contact with Doctor McCoy ignored the fact that Doctor McCoy was the doctor that advised Defendant to spend some time in the family store, the reason for which she was charged. An assertion of thoroughness should require review of the records from Doctors McCoy and Hawkins since counsel knew about them.

-7-

In view of the fact that counsel here was aware that Defendant was being treated for a mental health condition, the "education" or the ability of Defendant to "communicate" should not be relevant to counsel's decision to investigate Defendant's mental status. In many cases of incompetency, Defendant will be well educated and can communicate and that fact should not obviate counsel's duty to investigate, especially after counsel knows that his client is being treated for a mental health condition. A criminal defense lawyer should know that when a client is being treated for a mental health condition, the client may not be the source of authority for the client's condition or basis of treatment.

Similarly, the failure of Defendant's son and doctors to express concern about Defendant's competency should not be of any significance in this case. Counsel knew here that Defendant was being treated for a mental health condition. A Defendant provides the names of her treating physicians and mental health professionals to a lawyer so that the lawyer can evaluate the information from the professionals and make the judgment on case strategy. As *Strickland* makes clear, counsel has the duty to investigate. *Strickland* at 691 ("counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary"). Defendant's doctors have no such duty and indeed may not provide any information to counsel or the court, without the permission of the client, in light of the physician-patient privilege.

Even though counsel knew that Defendant was being treated for a mental health condition, he failed to contact Defendant's treating mental health professional before advising Defendant to enter into a plea. Counsel did not carefully evaluate the importance of the fact that Defendant was receiving mental health treatment. It was not unnecessary for counsel to contact Doctor Hawkins and counsel should not have relied on his untrained, non-medical judgment to conclude that Defendant's pain management could not affect her competency. Counsel's failure to investigate Defendant's mental health status did not result from a strategic choice or out of consideration that evidence from Doctor Hawkins would be harmful to Defendant's case. Accordingly, it was unreasonable for counsel not to investigate Defendant's mental health status before conferring with her on the advisability of entering into a plea.

During the evidentiary hearing, Doctor McCoy and Doctor Hawkins presented the picture of a disturbed, traumatized and incompetent patient who could not reasonably evaluate the consequences of entering into a plea. Doctor Hawkins testified that Defendant suffered from post traumatic stress disorder. *See* Transcript of April 29, 2004 proceedings at 5. According to Doctor Hawkins, this made Defendant indifferent about life, *Id*. at 6, and disinterested in the consequences of things. *Id*. at 7. Doctor Hawkins testified that Defendant was self-destructive. *Id*. at 10. He testified that Defendant was suicidal. *Id*. He testified that Defendant was on Demerol periodically, even though she could not

use it consistently due to tolerance problems with the medication. Doctor Hawkins testified that he would be skeptical of Defendant having made a knowing, voluntary and rational decision to enter a plea of guilty in this case. *Id* at 11.

Doctor McCoy testified that Defendant's ability to make a rational decision and understand the consequences of that decision were greatly impaired. *Id*. at 23. Doctor McCoy described Defendant as living with an unrelenting, nagging at times very severe overwhelming pain on one hand and with medication which caused extreme nausea and intractable vomiting on the other. *Id*. at 23-24. Doctor McCoy stated that he was concerned about the Defendant's suicidal ideation, and that he did not remember another patient in his practice over the course of seven years with whom he was as concerned. *Id*. at 25. Doctor McCoy testified that the short acting narcotics the Defendant was prescribed would impair or affect in a negative manner the cognitive function of the Defendant. *Id*. at 31.

The conclusions of these professionals about Defendant's mental and physical health at the time she entered into the plea were neither refuted nor challenged by the Government. Therefore, Defendant lacked the competency to enter into the plea based on the opinion of the doctors.

As the Supreme Court has stated, in order to prove that a counsel's action or omission were prejudicial to a Defendant's case, "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland* at 694. Here, had

-10-

counsel contacted Doctor Hawkins before Defendant entered into the plea, he would have likely questioned Defendant's competency to enter into the plea. Had counsel contacted Doctor McCoy, he would have more properly understood why Defendant was in the store and even known that Doctor McCoy considered Defendant's presence in the store therapeutic.[6] Thus, there is a reasonable probability that the outcome would have been different in this case both on the merits of the charge and Defendant's competency to enter into the plea.

Accordingly, I would vacate the district court's judgment and remand. Upon remand, I would direct that the district court set aside Defendant's plea of guilty and her sentence and I would direct that the district court determine Defendant's present competency. If Defendant is then found to be presently competent, the Government may consider whether further proceedings against the Defendant should be undertaken or whether the criminal proceedings should be dismissed.

---

[6] During the evidentiary hearing, Doctor McCoy testified that he thought Defendant being in the store, and even greeting customers, could be therapeutic. Transcript at 32.